**HUFFCO PETROLEUM CORPORATION,**
**Plaintiff,**

v.

**David H. MASSEY, Defendant.**

**Civ. A. No. H85-0229(NG).**

United States District Court,
S.D. Mississippi,
Hattiesburg Division.

Nov. 17, 1986.

---

David W. Dogan, III, Jackson, Miss., Sarah B. Moore, Huffco Counsel, Houston, Tex., for plaintiff.

Glenn Gates Taylor, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

GEX, District Judge.

Plaintiff, Huffco Petroleum Corporation ("Huffco"), brought this action against Defendant, David H. Massey, for the recovery of $241,588.85 in well costs which Huffco alleges Massey is personally liable for on the basis of (1) their "agreement whereby Defendant, along with others, agreed to participate to the extent of their proportionate ownership interest in the expenses of drilling an exploratory well ...",[1] and (2) equitable estoppel. For the reasons stated below, this Court is of the opinion that Massey's Motion for Summary Judgment should be granted.

## I. STATEMENT OF FACTS

The subject well at issue in this cause, the Huffco-Smith Heirs No. 1 Well ("the well"), was drilled pursuant to a farmout agreement Huffco had with Massey.

In September, 1984, Huffco filed a petition with the State Oil and Gas Board of Mississippi requesting the Board to grant it a permit to drill the well and to "force integrate" the unit for the well pursuant to Miss.Code Ann. Section 53–3–7 (Supp.1985) due to "several owners of small separately owned tracts or separately owned interests hav[ing] refused to voluntarily join in the drilling, completion and production of a well on said proposed unit."[2] The affidavit submitted by an officer for Huffco in support of the petition states that approximately 25% interest of the interest owners in the proposed unit was being requested for integration as a result of their failure to agree to participate in the mineral development. John Childress, a land manager for Huffco at the time of the events in question, stated at his October 29, 1985, deposition that although a specific list of persons whom Huffco was seeking to force integrate did not exist, Massey, Chevron, Pan-Canadian and Cenergy were among the parties who, at the time the force integration proceedings were taking place, had not signed joint operating agreements or Authorizations for Expenditures ("AFEs")

---

1. Complaint, p. 2.

2. Huffco's Petition to the Mississippi State Oil and Gas Board filed August 2, 1984. Under this statute the nonconsenting owners of drilling rights have a right to receive their share of whatever oil and gas might be produced from the well after the operator recovers its costs out of production.

indicative of their participation in the well.[3] In late September, 1984, Huffco received a permit to drill the well and force integrate the unit.

Once Huffco received the permit, it prepared a proposed joint operating form agreement and sent copies to the working interest owners, including Massey, who owned a 5% leasehold interest. On October 3, 1984, Massey returned the operating agreement to Huffco executed, but with numerous changes and revisions he had made. The Court need not itemize the changes Massey made to the proposed agreement as they may be sufficiently and accurately characterized as material in nature. Childress' deposition testimony confirms that Huffco never agreed to those changes.[4]

Subsequent to the Oil and Gas Board's issuance of the drill permit to Huffco, Huffco determined (based upon a topographical survey) that the site originally intended for the well was going to have to be moved to an exception location (alternate drilling site); to this end Huffco petitioned[5] the Board for approval in October, 1984. In support of the petition, Huffco obtained statements from the working interest owners which indicated (1) that they had agreed to participate with Huffco in drilling the well "subject only to the execution of a mutually acceptable operating agreement", and (2) that they did not oppose the proposed exception location.[6] The affidavit signed by Childress and filed in support of the petition on October 17, 1984, states that approximately 12.4975% of the interest owners had not agreed to participate in the well. At his first deposition, Childress identified this interest as either Chevron's or Pan-Canadian's, and as only Chevron's at his second deposition; Chil-dress ruled out the possibility that the figure represented Massey's interest.[7]

Drilling of the well commenced either in late December, 1984, or early January, 1985.[8]

On January 21, 1985, Huffco sent Massey a "cash call" letter soliciting payment for his prorata share of drilling costs for the well. Massey sent the letter back to Huffco within a few days thereafter (received by Huffco on January 28, 1985) with the following handwritten notation appearing on the bottom of the letter:

Gentlemen: Please send me the following:

1. Invoices to substantiate $600,000.

2. Assignment of my interest in well.

Payment will be forthcoming.

Thanks,

David H. Massey

Massey contends that the notation "[p]ayment will be forthcoming" refers to payment for an overdue assignment of additional acreage in the section in which the well unit was designated which would raise his record title from 5% to 12.5%.[9] Huffco, on the other hand, argues that the notation evidences Massey's willingness to remit his share of drilling costs, as did a telephone conversation Childress allegedly had with Massey shortly after Huffco received Massey's reply; Massey denies ever indicating such a willingness, if indeed the telephone conversation ever took place.[10]

On February 1, 1985, Huffco sent Massey a new proposed joint operating agreement for the well. By a letter dated February 27, 1985, Huffco sent Massey revised pages to the new proposed agreement. Neither of these documents incorporated the changes Massey had proposed to Huffco via his October 3, 1985, correspondence.

3. Childress Deposition No. I, pp. 72–75.

4. Childress Deposition No. I, pp. 13–15.

5. The petition for an exception location did not affect the previous force integration Huffco had filed with the Board.

6. Massey contends that the signature bearing his name on this document dated October 11, 1984, is not his. Massey Deposition, pp. 99.

7. Childress Deposition No. I, pp. 77–78; Childress Deposition No. II, p. 21.

8. Childress Deposition No. I, p. 68.

9. Massey Deposition, pp. 45–46, 82–83.

10. Childress Deposition No. II, pp. 32–34; Massey Deposition, p. 45.

Massey never agreed to or signed the new proposed joint operating agreement.[11]

Huffco claims that Massey attended a meeting on February 7, 1985, in Houston, Texas at which various officials from Huffco and Pogo Producing Company were present to discuss with Massey Huffco's request that it be granted a time extension under the farmout agreement it had with Massey.[12] Although Huffco maintains that Massey stated at the meeting he was "participating" in the well—which Massey denies—, Huffco concedes Massey did not say anything about paying or agreeing to pay his share of well costs and that the meaning of the term "participating" was not discussed. Childress further acknowledged that the only "participants" he had known in his experience were persons who had signed a mutually agreeable joint operating agreement or an AFE.[13]

The last communication between the parties appears to have occurred either in March or April, 1985, in a telephone conversation between Childress and Massey. Massey had called Childress concerning the assignment of a 7½% working interest which Huffco owed him and allegedly indicated that he would execute and return the joint operating agreement once the assignment was received.[14]

The well reached total depth in March, 1985. In May of that year, Huffco proposed to test and complete the well. The well never produced any oil or gas.

## II.  CONCLUSIONS OF LAW

A grant of summary judgment is appropriate when, viewed in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Bynum v. FMC Corp.*, 770 F.2d 556, 576 (5th Cir.1985). The moving party carries the burden of "showing"

—that is, pointing out to the Court—the absence of a genuine issue of material fact. *Id.; Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As to the requirement of materiality, "[o]nly disputes over facts that might affect the outcome of this suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). With respect to whether the factual dispute has created a genuine issue, "... summary judgment will not lie if the dispute about a material fact is 'genuine', that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the burden of the moving party is discharged, the burden shifts to the nonmoving party to go beyond the pleadings and by his own affidavits, or by the "depositions, answers to interrogatories, and admission on file, 'designate' specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Thomas v. Harris County,* 784 F.2d 648 (5th Cir.1986).

### A. *Massey's Alleged Agreement to Participate*

In the case *sub judice*, Huffco has alleged that Huffco and Massey entered into a joint operating agreement under which Massey agreed to be personally liable for his share of well costs. The Fifth Circuit's decision in *Sonat Exploration Co. v. Mann,* 785 F.2d 1232 (5th Cir.1986) confirms, however, that there must be a written promise to pay costs. *Also see,* Miss. Code Ann. Section 15–3–1(c) (1972). In *Sonat* the operator of an exploratory gas well sought recovery of drilling expenses from non-operators who had executed AFEs, but were not parties to the operating agreement covering the subject well. The Court affirmed the lower court's conclusion that the AFEs did not, standing alone, constitute a promise to pay and approved the

---

**11.** Childress Deposition No. I, p. 23; Massey Deposition, pp. 33, 39.

**12.** Childress Deposition No. II, p. 26.

**13.** Childress Deposition No. II, pp. 58–61.

**14.** Childress Deposition No. I, pp. 57–58; Childress Deposition No. II, pp. 36–37.

Tenth Circuit's characterization of an AFE as merely "an estimate of costs without binding effect in the industry." *Id.* at 1235. The court further found no detrimental reliance by the operator as a result of the non-operators' conduct.

In this case, the record (from the admissions of Childress to the affirmative statements by Massey) discloses indisputably that although Massey and Huffco negotiated for a mutually acceptable joint operating agreement, they never reached a mutually acceptable agreement—much less in writing—on such an instrument or any other promise by Massey to be personally liable for his share of well costs.[15] The written correspondence that does exist between the parties is clearly not sufficient to impose liability on Massey or create a genuine issue of same. Accordingly, the Court is of the opinion that Massey is entitled to a summary judgment on Count I of Huffco's Complaint.

### B. Equitable Estoppel

Count II of Huffco's Complaint alleges detrimental reliance on Massey's alleged representations of participation in the well, which, it is urged, should estop Massey "from denying any liability for his proportionate ownership interest in the expenses incurred in drilling The Well."[16]

Mississippi law's requirement that contracts involving oil and gas development be reduced to writing is not imposed if the prerequisites of equitable estoppel are shown to exist. *Sonat, supra,* n. 1; *Sanders v. Dantzler,* 375 So.2d 774, 776–77 (Miss.1979). The Mississippi Supreme Court has explained the requirements of equitable estoppel as follows:

"We have often explained that the following factual elements are prerequisite to application of the doctrine:

"(1) Belief and reliance on some representation;

"(2) Change of a position as a result thereof;

"(3) Detriment or prejudice caused by the change of position. * * *

"The doctrine of equitable estoppel is to be cautiously applied. It is a shield, not a sword."

*Covington County v. Page,* 456 So.2d 739, 741 (Miss.1984)

"The essential elements of an equitable estoppel are:

"Conduct and acts, language or silence, amounting to a representation or concealment of material facts, with knowledge or imputed knowledge of such facts, with the intent that representation or silence, or concealment be replied upon, with the other parties' ignorance of the true facts, and reliance to his damage upon the representation or silence."

*Chapman v. Chapman,* 473 So.2d 467, 470 (Miss.1985).

"A party asserting equitable estoppel must show (1) that he has changed his position in reliance upon the conduct of another and (2) that he has suffered detriment caused by his change of his position in reliance upon such conduct."

*PMZ Oil Co. v. Lucroy,* 449 So.2d 201, 206 (Miss.1984).

The burden of establishing the elements of an estoppel is on the party asserting the estoppel. *Hathorn v. Illinois Central Gulf Railroad Co.,* 374 So.2d 813, 817 (Miss.1979). The existence of the elements of an estoppel must be established by the preponderance of the evidence. *Gates v. Owen Chevrolet Co.,* 294 So.2d 179, 180 (Miss.1974). Thus the standard by which the Court must gauge the Defendant's motion against Huffco's claim of estoppel is that a genuine issue of material fact must exist as to whether Huffco was induced by Massey to do something different from what Huffco otherwise would have done, and which resulted to Huffco's harm, and that Massey knew or had reasonable cause to know that such consequences might follow. *Accord, PMZ Oil Co., supra,* at 206.

---

**15.** Childress Deposition No. I, pp. 13–16 and 36; Childress Deposition No. II, pp. 57–58; Massey Deposition, pp. 12–13, 24–25, 39, 45, 58, 72 and 77.

**16.** Complaint, p. 4.

■ The Court has reviewed the record in this cause, including the pleadings, depositions, affidavits and answers to requests for discovery filed to date, and concludes that—for the reasons that follow—Huffco has failed to demonstrate a genuine issue for trial on its claim of estoppel. In other words, it is the Court's determination that reasonable jurors could not, by a preponderance of the evidence presented, find or draw conflicting inferences about Huffco's entitlement to a verdict on Count II of the Complaint.

As of September, 1984, Huffco was well aware that Massey owned an interest in the land which Huffco intended to include in the unit which Huffco proposed to form to drill the well. Huffco, however, proceeded to petition and obtain from the Oil and Gas Board a permit to force integrate the unit, including Massey's interest, *before* it had any discussions with Massey about drilling the well.[17] According to Childress, "[a]t the time, we didn't know who all the participants would be in this well and Huffco wanted to drill this well as soon as possible."[18] Childress Deposition No. I, p. 69. Only *after* the unit's force integration was accomplished did Huffco forward Massey a proposed joint operating agreement, to which Massey did not in all material respects agree; Huffco did not agree to Massey's counterproposal which he submitted in October, 1984.

Significantly, in either late December, 1984, or early January, 1985, Huffco began drilling the well without either a written agreement with Massey that he would be personally liable for his share of costs or a consummated oral understanding to the same effect. Drilling operations had progressed more than a month when Massey allegedly stated at the February 7, 1985, meeting in Houston, Texas, that he was "participating" in the well. It is the opinion of the Court that Huffco did not drill the well because Massey indicated at this time—assuming he did so—that he was participating in the well. Further, the Court is not persuaded that a triable factu-

al issue has been presented as to whether Huffco continued to drill the well because of anything Massey did or did not do. As Childress testified at his deposition:

Q. You are telling me that if Huffco had known that Mr. Massey had not agreed to be personally liable for his share of drilling and completion costs that Huffco wouldn't have drilled the well at all?

A. That's a hypothetical question that I can not answer.

Childress Deposition No. I, p. 85.

To state the matter in terms of language used by the Court in *Sonat,* the Court does not find that a genuine issue of material fact has been raised to whether Massey's conduct caused Huffco to do anything it would not otherwise have done. *Sonat, supra,* at 1235.

The affidavits signed by M.L. Harvey and D.O. Juce submitted by Huffco in opposition to the motion do not claim (1) that Huffco reached an agreement with Massey on an operating agreement or on an AFE (2) that Massey orally promised he would pay well costs or (3) that Huffco drilled the well or incurred any costs because of Massey.

Finally, the Court points out that its consideration of the merits of the instant motion has viewed the few factual discrepancies which do exist in the record in the light most favorable to Huffco. Nevertheless, Huffco's claim of equitable estoppel is insufficient as a matter of law. For example, even if Massey did execute the form statement showing his approval for the exception location, the statement still conditions the signatory's participation on the execution of a mutually acceptable operating agreement—which never occurred—between Huffco and Massey. With respect to Massey's "[p]ayment will be forthcoming" notation on the "cash call" letter he returned to Huffco in January, 1985, any ambiguity concerning its reference to drilling costs or the assignment is removed by the explanation given by Massey in his

---

**17.** Childress Deposition No. II, p. 17.

**18.** Childress Deposition No. I, p. 69.

deposition testimony.[19] Finally, given the Court's above findings on the legal necessity of a working interest owner's written promise to pay his share of well costs in order to impose liability, and the timing of Huffco's decision to commence drilling operations, any question of fact with regard to whether Massey expressed in his telephone conversations with Childress a willingness to "participate" is simply not germane to the existence of equitable estoppel *vel non*.

The financial detriment Huffco has experienced from failing to timely procure from Massey a signed, mutually acceptable joint operating agreement prior to the initiation of costly drilling operations is a direct consequence of its own making and cannot under Mississippi law be attributed to Massey's conduct or representations. The Court concludes that Massey remains a force integrated owner not personally liable for any of the subject well costs. Accordingly, the Defendant is entitled to a summary judgment on Count II of Huffco's Complaint.

### III. CONCLUSION

"... [T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, supra.* Such a scenario obtains here. Defendant Massey's Motion for Summary Judgment should be granted.

An Order consistent with the findings in this Opinion will be entered by the Court.

---

**19.** Massey Deposition, pp. 45–46 and 82–84.