**HUNT ENERGY CORPORATION, Plaintiff,**

v.

**CROSBY–MISSISSIPPI RESOURCES, LTD., et al., Defendants.**

**Civ. A. No. H85–0265(L).**

United States District Court, S.D. Mississippi, Hattiesburg Division.

May 1, 1989.

Alex A. Alston, Jr., Barry H. Powell, Thomas W. Tardy, III and Janice Holley Parsons, Thomas, Price, Alston, Jones & Davis, Jackson, Miss., and Kathleen A. Berry, Hunt Energy Corp., Dallas, Tex., for plaintiff.

Wallace R. Gunn, Gunn and Schleslinger, Hattiesburg, Miss., and Lee Davis Thames, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

There are pending before the court four motions: (1) Plaintiff's motion for partial summary judgment on the issue of liability; (2) defendants' cross motion for summary judgment; (3) defendants' motion to strike

the affidavit of C. Danny Foster; and (4) defendants' application for review of the magistrate's order denying defendants leave to file a counterclaim. These motions have been fully briefed and the court has considered the memoranda of authorities together with attachments submitted by the parties.

## SUMMARY JUDGMENT

In this action, Hunt Energy Corporation (Hunt) seeks recovery of the sum of $852,-657.63, together with interest and attorney's fees, representing defendants' pro rata share of unpaid costs incurred in the development and operation of three natural gas wells and a natural gas treating plant. Hunt, the operator of the wells and plant at all pertinent times, contends that while defendants did not execute a joint operating agreement for the development of these properties, they are nevertheless working interest owners who, by their conduct, are contractually obligated to pay their pro rata shares of expenses. Defendants[1] claim that they have no contractual relationship with Hunt and that their participation in the drilling activities and liability for expenses in connection with those activities is that of nonconsenting interest owners whose interests were force integrated pursuant to Miss.Code Ann. § 53-3-7 (1972).

Section 53-3-7 establishes the circumstances under which separately owned tracts of land may be validly integrated or pooled by the State Oil and Gas Board. Such integration is permitted when the persons owning the drilling rights in a unit and the rights to share in the production of the unit agree to pool their interests or, if all such persons have not agreed to integrate their interests, the Board may force integrate those interests in order to prevent waste or to avoid the drilling of unnecessary wells. When integration occurs, the force integrated owner becomes liable for his pro rata share of operating expenses only if the well produces "in paying quantities" or reaches payout;[2] this occurs after the operator has recouped the costs incurred in drilling, completing and operating the well. Once the well reaches payout, the operator is required to account to all interest owners for their proportionate share of production revenues. If, however, the well does not produce in paying quantities, nonconsenting interest owners whose interests have been force integrated have no liability to pay any part of the drilling and development expenses of the operator.

Stated succinctly, the dispute in this case is whether defendants were consenting interest owners who, by virtue of a contractual arrangement with plaintiff, agreed to share in the expenses of the drilling and operation of the wells and hence to share in the risk that the wells would not be commercially productive, or, whether defendants were nonconsenting interest owners which, under the statute, are liable for their share of expenses only if the wells reached payout.

The three gas wells at issue, the No. 1 Rhoda Lee Brown, the No. 1 Gordon Brown and the No. 1 S.G. Thigpen, are located in

---

1. Crosby–Mississippi Resources, Ltd. (CMR) is a partnership in which defendants Lynn Crosby Gammill and Stewart Gammill, III are the general partners. The Gammills are named as defendants in their capacity as general partners whose liability, if any, is dependent upon the liability of CMR. CMR was a working interest owner in each of the three units at issue. Plaintiff seeks to recover from CMR and hence the Gammills the sum of $729,236.96. Because the Gammills' interest is derivative of that of CMR, these defendants will be treated as one, CMR, for purposes of this opinion. From defendant Interpine Lumber Company (Interpine), which was a working interest owner in one of the units, the Rhoda Lee Brown, plaintiff demands judgment for $123,420.67. Unless otherwise stated, as used in this opinion, "defendants" will refer to CMR and Interpine whereas "defendant" will refer to CMR only.

2. Section 53-3-7(3) specifically provides that

   [w]hen production of oil and gas is not secured in paying quantities as a result of such integration or pooling of interests, there shall be no charge payable by the nonconsenting owner or owners as to such owner's nonconsenting interest.

   The parties agree that the phrase "in paying quantities" as it is used in this section refers to a situation in which the operator realizes a profit. *See Monsanto Chem. Co. v. Sykes,* 245 Miss. 207, 147 So.2d 290, 295 (1962).

the Catahoula Creek Field in Hancock County, Mississippi. Hunt owned the majority of mineral interests in the Catahoula Creek Field. Prior to drilling any of the wells, Hunt had negotiations with CMR but had not obtained an executed joint operating agreement with either defendant when drilling began. Because Hunt was under time constraints to commence drilling operations,[3] Hunt petitioned the Oil and Gas Board to force integrate the nonconsenting interests into drilling units. Following force integration, the three wells were drilled. The Rhoda Lee Brown and Gordon Brown were completed as producers but according to defendants never reached payout.[4] The third, the Thigpen, was a dry hole. Hunt's theory in this case is that even though the defendants never executed a joint operating agreement, defendants, after being force pooled, subsequently entered into a contractual agreement with Hunt to pay their proportionate share of the drilling costs. Perhaps more accurately, the theory is that although neither defendant ever executed a formal joint operating agreement with Hunt, there was an oral or implied contract for defendants to participate as full working interest owners in the drilling, development, and operation of the three wells and the construction and operation of the gas treatment plant.

## STATUTE OF FRAUDS

The Fifth Circuit has concluded that agreements for the development of oil and gas interests must be in writing under Mississippi's statute of frauds, Miss.Code Ann. § 15–3–1 (1972), to be enforceable. In *Sonat Exploration Company v. Mann*, 785 F.2d 1232 (5th Cir.1986), the Fifth Circuit considered whether, under Mississippi law, a nonoperator who was not a party to the operating agreement covering the subject gas well but who had executed four AFEs (Authorizations for Expenditures) was obligated to pay drilling costs. The court concluded that in the absence of an accompa-

nying operating agreement, the AFEs did not create a binding obligation. *Sonat*, 785 F.2d at 1233, 1234. In so doing, the court noted that it

> had been cited to no authority which would permit a contract involving mineral development ... to be oral. We tend to the conclusion that the Mississippi Supreme Court would require that contracts involving oil and gas development be reduced to writing.

*Sonat*, 785 F.2d at 1234 n. 1 (citing *Bell v. Hill Bros. Const. Co., Inc.*, 419 So.2d 575 (Miss.1982)). The court also found the testimony of Sonat's vice president that Sonat generally tried to make all working interest owners parties to the operating agreement as suggestive of "the imperative of the operating agreement." *Sonat*, 785 F.2d at 1235. While Hunt would have the court simply regard these statements by the Fifth Circuit as dicta, in a subsequent case the Fifth Circuit reaffirmed this proposition. *Huffco Petroleum Corporation v. Massey*, 660 F.Supp. 71 (S.D.Miss.1986), *aff'd*, 834 F.2d 540 (5th Cir.1987), involved facts substantially similar to those of the case at bar. There, Huffco petitioned the Oil and Gas Board to force integrate the interests of several owners in the drilling unit, including Massey. Thereafter, but prior to drilling, Huffco sent a proposed joint operating agreement to Massey. Massey made a number of substantive changes and executed and returned the agreement to Huffco; Huffco did not agree to the changes and never executed the document. After drilling began, Huffco sent Massey a request for payment of Massey's pro rata share of $600,000 drilling costs. Massey responded with a request for invoices to substantiate the $600,000 amount together with the notation, "Payment will be forthcoming." Though Massey never executed the joint operating agreement, Huffco provided him with daily drilling reports and open access to the well site, and Massey offered advice to Huffco concern-

---

**3.** Hunt had numerous farm out agreements with others which required it to drill the wells within certain time periods failing which it would not earn acreage that was the subject of the agreements.

**4.** Hunt states that it does not know whether these two wells reached payout. That matter will be discussed *infra.*

**1382**

ing drilling and completion of the well. When the well was not commercially productive, Massey refused to pay any part of the drilling costs, and Huffco sued to recover Massey's pro rata share of the costs. Huffco alleged that Massey had entered into a joint operating agreement under which he implicitly and explicitly agreed to assume personal liability for his share of the well costs. *Huffco,* 660 F.Supp. at 74. The court, citing *Sonat,* concluded that "there must be a written promise to pay costs," *id.* at 75, and granted summary judgment based on its finding that

> the record ... discloses indisputably that although Massey and Huffco negotiated for a mutually acceptable joint operating agreement, they never reached a mutually acceptable agreement—much less in writing—on such an instrument or any other promise by Massey to be personally liable for his share of well costs. The written correspondence that does exist between the parties is clearly not sufficient to impose liability on Massey or to create a genuine issue of same.

*Id.* On appeal, the Fifth Circuit determined that summary judgment had been appropriately entered since Huffco had not proven an agreement by Massey to share expenses; Massey was therefore not liable for a pro rata share of expenses in the unproductive well. The court observed, as had the district court, that

Massey and Huffco negotiated for, but never agreed to, a mutually acceptable joint operating agreement. Although they exchanged drafts of proposed operating agreements, the parties never reached an express agreement that Massey would pay any part of the well expenses.

*Huffco,* 834 F.2d at 542. The court further determined that the meaning of Massey's handwritten message that "payment will be forthcoming" was "too ambiguous to constitute an enforceable written agreement by which Massey obligated himself to pay 12.5% of the well's expenses." *Id.*

■ These cases provide clear authority that an agreement to share in the expense of development of mineral interests must be in writing under Mississippi law to be enforceable.[5] The question becomes whether there is such a writing in this case, and if not, whether there is some exception to the statute of frauds which might apply.[6]

### THE EVIDENCE

Clearly, the parties never executed a joint operating agreement and, according to Hunt's own witnesses, the parties never actually reached agreement on the terms of an operating agreement.[7] And a review of the pertinent testimony and documents in this case reveals the absence of any writing

---

5. Section 53-3-7, as amended effective March 23, 1987, now defines the term "nonconsenting owner" as "an owner of drilling rights which the owner has not agreed, *in writing,* to integrate in the drilling unit." Miss.Code Ann. § 53-3-7(1)(c) (emphasis added). The statute now further provides that in the event a pooling order is issued by the board, and a nonconsenting owner subsequently agrees in writing to participate as a consenting owner, the determination of his liability for expenses will be taken out from under the statute. Miss.Code Ann. § 53-3-7(2)(g). While the agreements that are involved in this case were made in 1982 when there was no statutory requirement that an agreement to participate subsequent to a forced pooling order be in writing, the court notes the amendments and the emphasis on a "writing" are consistent with the conclusions reached in *Sonat* and *Huffco* and in this case.

6. Hunt has not taken the position in this case that there does exist a writing sufficient to satisfy the requirements of the statute of frauds or

that there is any applicable exception to obviate the need for such a writing. Rather, its argument is premised on the inapplicability of the statute of frauds. However, all the relevant evidence is before the court and therefore, the fact that plaintiff has not argued these issues does not hamper the court's ability to consider them.

7. Eddie Harper, Hunt's district manager for Mississippi, is the individual who negotiated with defendants for Hunt and who was Hunt's Rule 30(b)(6) deposition witness. Harper testified that "the operating agreement was never accepted by [CMR] because they did not like some of the provisions in it." Harper also stated that as of January 1983 it was obvious to Hunt that "there was not going to be an operating agreement." Moreover, a letter from Hunt to defendants in February 1983 recited Hunt's understanding that defendants had "no intention of executing [a] written operating agreement."

which could be considered sufficient evidence of a contract between the parties. This evidence will be considered separately as it relates to the three wells.

### No. 1 Rhoda Lee Brown

In mid–1980, Hunt petitioned the State Oil and Gas Board for force integration of all nonconsenting interest owners in the Rhoda Lee Brown unit. The order granting integration recited that "efforts have been made, and are continuing, to reach agreement with the owners of those interests, but these efforts have been unsuccessful." The Rhoda Lee Brown well was spudded on June 26, 1980 and was completed on August 15, 1981. The well was put on production to Tennessee Gas Pipe Line Company (Tennessee Gas) on October 28, 1982 and produced until 1985. In August 1981, an interoffice memo authored by Eddie Harper of Hunt recommended that Hunt continue its drilling program "and offer the [defendants] the same opportunity to participate as other owners of interest on a well by well basis." Then, in September Hunt notified Stewart Gammill by letter that a joint operating agreement draft for the Rhoda Lee Brown would be forthcoming; shortly thereafter Hunt followed up with a proposed joint operating agreement. Neither defendant executed this agreement. In October 1981, correspondence from Hunt to Gammill indicated that Hunt was "look[ing] forward to the early receipt of [CMR's] written commitment to pay its proportionate share of all costs associated with the drilling, completion and operations of the Rhoda Lee Brown well."

In July 1982, Hunt wrote Tennessee Gas and, among other things, explained that "[CMR] did not agree to the drilling of the No. 1 Rhoda Lee Brown well. Pursuant to order 186–80 of the Oil and Gas Board … [CMR's] interests in the drilling rights and production from the No. 1 Rhoda Lee Brown unit were force integrated and pooled to be part of said unit." In September 1982, CMR sent Hunt a payment on the Rhoda Lee Brown unit of $1,467,582.22 along with an explanation that payment was made without waiver of its right to determine and verify its correct ownership.

Then in October 1982, a letter prepared by Eddie Harper and addressed to but not sent to CMR purported to "thank [CMR] for [its] recent election to participate in the No. 1 Rhoda Lee Brown well." In December 1982, CMR paid Hunt $166,243.83. Hunt again wrote to CMR in February 1983:

> In … October 20, 1982, you were invoiced for interest accrued on past-due sums pursuant to the terms of the operating agreement for No. 1 Rhoda Lee Brown Unit, which agreement had been submitted to you earlier. This interest billing was made by Hunt Energy based upon the expectation that CMR and Interpine would execute such operating agreement, which … set forth the specific rate of interest applicable to past-due amounts. *Since you have indicated since the October, 1982 billing no intention of executing said operating agreement for this unit, we hereby withdraw all claims for interest* (emphasis added).

Finally, in February 1983 Hunt explained to Tennessee Gas by letter that Hunt was entitled to recoup certain expenses from CMR and Interpine in connection with the Rhoda Lee Brown well "pursuant to the force pooling order."

In this case, as was the case in *Huffco*, "[t]he written correspondence … between the parties is clearly not sufficient to impose liability on [defendants] or create a genuine issue of same," *Huffco*, 660 F.Supp. at 75, as regards the Rhoda Lee Brown well. The only written evidence that CMR had elected to participate in the Rhoda Lee Brown well was the October 1982 letter signed by Eddie Harper but not by CMR which was never even sent to CMR. This letter, since it was not signed by CMR, the party to be charged, is obviously not sufficient to satisfy the requirements of the statute of frauds. As regards Interpine, there is nothing to show that there were ever any negotiations with Interpine much less an agreement in writing that Interpine was to share in the expenses of development of the unit.

### No. 1 Gordon Brown

As with the Rhoda Lee Brown well, Hunt petitioned the Oil and Gas Board in

July 1981 for force integration of the Gordon Brown unit at a time when it concededly had no operating agreement with CMR. The order granting the petition recited that the nonconsenting interest owners "have refused or failed to enter into any type of agreement with [Hunt]." Drilling of the well commenced on October 16, 1981 and the well was completed in August 1982 and produced until 1985. Hunt had by letter requested that defendant either participate in the drilling or lease its interest to Hunt but defendant did not respond.

On January 4, 1982, CMR sent Hunt a payment of $685,303.59; the check stated that it was for the estimated costs of drilling the Gordon Brown well to the casing point. On January 5, Hunt wrote Stewart Gammill advising that the payment was received; that transmittal letter included a copy of a Gordon Brown AFE which defendant never signed. Hunt again corresponded with CMR on February 28, 1982: "We received your message confirming the election by [CMR] to participate in the completion attempt on the No. 1 Gordon Brown well." The letter further requested that CMR confirm its election in writing and requested that the January 5 AFE be approved. There was never a written confirmation and the AFE remained unexecuted.[8] From March through September of 1982 CMR sent Hunt monthly payments totalling $939,562.30. However, it was not until August 1982 that Hunt sent defendant the first draft of a proposed joint operating agreement; it is agreed that neither it nor

any other operating agreement was ever executed by defendant. Finally, the February 1983 letter to defendant from Hunt regarding the No. 1 Rhoda Lee Brown, discussed *supra*, and the February 1983 letter from Hunt to Tennessee Gas regarding Hunt's entitlement to recover expenses from defendant "pursuant to the force pooling order," also discussed *supra*, referred to the Gordon Brown unit as well.

As was the case with the Rhoda Lee Brown well, the only written evidence of an agreement between the parties concerning the Gordon Brown well was a letter from Hunt confirming a verbal election by CMR to participate in the well. And here, despite Hunt's specific request for written confirmation of CMR's alleged election to participate, none was ever forthcoming. CMR never signed a joint operating agreement and despite repeated requests, never signed any of the AFEs presented by Hunt for approval.[9]

Hunt claims that throughout the drilling period it provided defendants with copies of confidential drilling reports and well logs, a fact which it claims demonstrates the existence of an implicit or oral agreement between the parties. Again, however, an oral or implicit agreement will simply not suffice; there must be a *writing* evidencing that agreement.[10] Finally, while it is undisputed that defendant paid every invoice presented by Hunt, the fact of such payment as does not deliver plaintiff from proving a *written agreement*[11] or an exception to the requirement of a written agreement.

---

8. According to plaintiff, prior to its sending the February 8 letter, Stewart Gammill had orally informed Hunt's representatives that CMR wanted to share in the risk of the Gordon Brown well and was going to participate in both the Gordon Brown and the Rhoda Lee Brown wells. Plaintiff claims that in February 1982 defendant verbally confirmed its election to participate in the Gordon Brown well. Because the statute of frauds applies, the question is whether there is *written* evidence demonstrating the existence of such an agreement; any oral representations made are not binding absent written evidence thereof. Here, by interoffice memo from Eddie Harper to Jim McGowan in February 1982, Harper, while stating that defendant had "elected to participate in the completion [of the Gordon Brown]," acknowledged that he

"[had] not received anything in writing as of [that] date."

9. In June 1982, Lynn Crosby Gammill, on CMR's behalf, signed a letter agreeing to a sand fracturing operation on the Gordon Brown. However, that was not an agreement to share in the expenses of the drilling of the well. It was merely an agreement to a particular method of drilling.

10. In *Huffco*, Massey was provided with daily drilling reports. Massey's being provided with that information did not affect the outcome of that case; summary judgment was nevertheless entered.

11. See *infra* note 14.

## No. 1 S.G. Thigpen

The S.G. Thigpen was unitized and CMR's interest force integrated by an October 1981 order of the Oil and Gas Board. Hunt began drilling operations in early 1982. In March of 1982, a Hunt interoffice memo indicated that "[CMR] did not agree to the drilling of the No. 1 S.G. Thigpen well." In April, a Hunt letter to Stewart Gammill showing CMR's ownership interest in the unit and proportionate share of well costs included an AFE for the S.G. Thigpen; defendant did not execute the AFE. Later, in July 1982 Hunt, in a letter to Tennessee Gas, stated

> [CMR] did not agree to the drilling of the No. 1 S.G. Thigpen. Pursuant to order 521–81 of the Oil and Gas Board of Mississippi, [CMR's] interest in the drilling rights and production in the No. 1 S.G. Thigpen were force integrated and pooled to be part of said unit.

On August 4, 1982, Hunt sent CMR a joint operating agreement for the Thigpen well; the agreement was never executed.

According to plaintiff, in an August 5 conversation between Stewart Gammill and Eddie Harper, Gammill indicated CMR's desire to participate in the drilling of the Thigpen well. That day, Harper wrote Gammill thanking him for his "telephone call ... indicating [CMR's] desire to participate in the drilling of the [S.G. Thigpen] well," and requesting a confirmatory letter of defendant's election to participate. Enclosed was an AFE. CMR did not execute the AFE but did, on August 6, write to Harper:

> This is to confirm that [CMR] does elect to participate in the above-captioned well [Thigpen] on the same terms and conditions as in the Gordon Brown.

Enclosed is a check in payment of our share, as billed.

> As in the Gordon Brown, we do not admit the accuracy of our interests as set out in your bill; and reserve all rights to a future determination of our interests.

> Daily reports and other information should be sent as in the Gordon Brown.

Enclosed was a payment to Hunt in the amount of $381,002.16 representing CMR's proportionate share of costs to date. A few days later, Hunt began providing CMR with well data on the Thigpen.

In August CMR consented in writing to the plugging and abandoning of the well. On September 14 CMR confirmed in writing its consent to the completion of the well and on September 24, 1982 paid $18,116.67 for its pro rata share of a salt water disposal well for the Thigpen well. Finally, on February 17, 1983, Hunt wrote to CMR explaining that it had expected that CMR would have executed a joint operating agreement, yet acknowledging that CMR had indicated "no intention of executing a written operating agreement."

The situation as it relates to the S.G. Thigpen well differs from that presented with regard to the Rhoda Lee Brown and Gordon Brown wells; here, there is a written confirmation of CMR's "elect[ion] to participate" in the well. However, even assuming that an election to participate is the equivalent of an election to "share the risk" or "share in the expenses" of development of the well,[12] there was never an agreement on terms and conditions. And, taking it one step further, even assuming there was an agreement on terms and conditions, plaintiff has not attempted to establish what those terms and conditions were.[13]

---

12. There has been no proof that the parties ever discussed the meaning of the phrase "election to participate." In *Huffco*, the district court addressed a similar issue, stating

> [a]lthough Huffco maintains that Massey stated at the meeting he was "participating" in the well—which Massey denies—Huffco concedes Massey did not say anything about paying or agreeing to pay his share of well costs and that the meaning of the term "participating" was not discussed. Childress (for Huffco) further acknowledged that the only "partici-

pants" he had known in his experience were persons who had signed a mutually agreeable joint operating agreement or an AFE.

*Huffco*, 660 F.Supp. at 74. Similarly, in this case, there is nothing to indicate the meaning of the phrase "election to participate."

13. Although the letter of confirmation referred to participation by defendants on "the same terms and conditions as in the Gordon Brown well," there was never any writing indicating what those terms and conditions were and

**1386**

Significantly, in a meeting between Eddie Harper and Stewart Gammill on September 20, 1982—*after* the written confirmation of CMR's "election to participate"—discussions or negotiations were had concerning specific items and terms. Harper's notes concerning the meeting, under the heading "Questions to be considered in *negotiating final agreements* with CMR on Catahoula Creek" (emphasis added), indicated that CMR had elected to participate in the Gordon Brown and S.G. Thigpen wells and that it was arranging financing to pay upon the Rhoda Lee Brown, but there were questions which remained unresolved. At the end of his notes, Harper wrote, "NOTE: We have no signed or agreed to [joint operating agreement] with CMR." Harper's notes demonstrate that at the time of and following CMR's election to participate in the Thigpen unit, negotiations were ongoing and CMR had not yet agreed to the terms of a joint operating agreement. Further, in deposition testimony, Hunt representatives plainly acknowledged that an agreement was never reached. For example, Harper testified that "the operating agreement was never accepted by CMR because they did not like some provisions of it."

### Exceptions To Statute Of Frauds

■ Because the statute of frauds applies to the alleged agreement at issue and there is no written agreement signed by either defendant, the question arises whether any exception to the requirement of a writing applies. The only such exception which has potential application here is equitable estoppel which, under Mississippi law, is a "well-established" exception to the statute of frauds found at Miss.Code Ann. § 15-3-1.[14] *PMZ Oil Co. v. Lucroy,* 449 So.2d 201 (Miss.1984). A party asserting equitable estoppel must prove "(1) that he

has changed his position in reliance upon the conduct of another and (2) that he has suffered detriment caused by his change of position in reliance upon such conduct." *PMZ Oil,* 449 So.2d at 206. In this case, there has been no showing, and indeed there could be no showing, that Hunt relied on any representation or other conduct by either defendant in proceeding with drilling operations. While Hunt surely hoped, and perhaps even anticipated, that it could arrive at a mutually acceptable agreement with defendants, that hope did not spring from any conduct of defendants and it is certainly not a sufficient basis to support a finding of reliance. The lack of detrimental reliance is evidenced by the fact that Hunt force integrated the units and proceeded to drill even in the absence of an operating agreement with defendants and with the knowledge that an agreement had not been reached. In *Huffco,* the Fifth Circuit likewise rejected a claim of equitable estoppel by Huffco, stating,

[a]ssuming that Massey represented himself as a participant in the well's expenses, Huffco has failed to show that it relied to its detriment on Massey's representation. Huffco did not show that Massey's conduct caused Huffco to do anything it would not otherwise have done. Despite its initial submission of a draft agreement, Huffco began drilling the well without reaching an agreement with Massey to participate in the costs. Huffco also continued drilling to completion even though Massey never indicated he was willing to execute a joint operating agreement in a form acceptable to Huffco....

*Huffco,* 834 F.2d at 543. Hunt, as operator of the drilling units, accepted the risk that an agreement would not materialize, and was aware of that risk before it began

plaintiff has presented no proof of any sort as to terms and conditions allegedly agreed upon.

**14.** The fact that defendants, or at least CMR, made payments to Hunt does not save plaintiff from the lack of a written agreement. If it were the case that the statute of frauds were inapplicable, the fact that money was paid would be evidence indicating that there was an oral or implied agreement; the statute of frauds does,

however, apply. Further, if, under Mississippi's general statute of frauds, there were a recognized exception for partial performance, the payments would probably bring this case within the exception. There is, however, no such exception. *See Stahlman v. National Lead Co.,* 318 F.2d 388, 395 (5th Cir.1963) (settled law in Mississippi that part performance will not take case from under general statute of frauds).

development of the units. There has been no suggestion that either defendant represented, either through words or conduct, that it would agree to share expenses until long after the development had started. Under these circumstances, there can be no detrimental reliance and hence no equitable estoppel as a matter of law.

### Gas Treating Facility

■ At the September 20 meeting between Stewart Gammill and Eddie Harper, Harper informed Gammill that a joint facilities agreement covering the production facilities in the Catahoula Creek Field would be offered; the owners of the gas being produced were to be offered an opportunity to own an interest in the gas treatment facility that Hunt was to construct to process the gas being taken from the wells in the field. If a participant elected not to own an interest, his gas would be processed for a fee. On September 24, along with a CMR check to Hunt for $1,467,-582.22 as a payment on the Rhoda Lee Brown unit, CMR confirmed in writing that CMR would be offered its pro rata share of joint ownership of the treatment plant in exchange for CMR's payment of its proportionate share of the cost of the plant. Subsequently, on October 21, 1982 CMR, through Lynn Crosby Gammill, executed a letter agreement to participate in the ownership of the processing plant by the payment of its pro rata share of the cost of constructing and operating the plant. The letter agreement which was prepared by Howard L. Winters, Hunt's gas department manager, provided as follows:

> Those parties electing plant ownership ("Owners") will share plant investment, operating costs and treating fee revenues in proportion to their plant ownership with other plant owners.

The letter requested that each interest owner make its election regarding plant ownership and those who chose plant ownership were asked to approve an AFE for the plant. The letter and the AFE were signed by CMR and returned to Hunt. Later, on April 6 and April 30, 1983, CMR made payments to Hunt of $56,425.21 and $100,000, respectively, in connection with the facility.

In the opinion of the court, CMR's agreement not only to "participate," but also to share in the ownership of the processing plant is clear and unambiguous and, unlike the alleged agreements to participate in the gas wells, is in writing. CMR agreed to "share plant investment (and) operating costs." In fact, in the letter accompanying CMR's April 6 payment, Stewart Gammill stated,

> By tendering this check to you we do not waive our rights to determine *our share of actual costs* and to apply any and all overpayments to *our share of other costs incurred in the installation of any and all facilities at the treating plant at Catahoula Creek Field,* nor do we agree to any costs or expenditures in excess of those set out on the above referenced AFE's (emphasis added).

CMR acknowledges that it signed an AFE with respect to the gas treating facility but argues that under the authority of *Sonat,* the execution of an AFE does not constitute a promise to pay. *See, Sonat,* 785 F.2d at 1234–35. Here, however, CMR did more than simply execute an AFE; it signed an agreement to participate as an owner of the facility. Defendant also argues that while it did execute the letter agreement to share in the ownership of the facility, there has as yet been no final determination of CMR's pro rata share with respect to the facility and that a final determination of its obligations regarding the plant is to be determined by reference to section 53–3–7. However, the lack of such a final determination does not preclude summary judgment in favor of Hunt on the issue of liability; indeed, Hunt has not sought judgment on the issue of amounts due.

In sum, the court concludes that the described writings, consisting of the letter agreement, correspondence between Hunt and CMR, and the AFE, demonstrate the existence of an agreement between CMR and Hunt for CMR's payment of its pro rata share of the cost of construction and operation of the gas treatment facility. Hunt is therefore entitled to summary judgment on the issue of CMR's liability for payment of its proportionate share of

**1388**

the costs associated with the gas treatment facility. This is not true as to Interpine's alleged liability since there is a complete absence of proof that Interpine was offered or accepted an offer of an opportunity to share in the ownership of the facility.

### Conclusion

While the actions of defendants are certainly consistent with plaintiff's position that defendants had agreed to participate in the development of the wells,[15] the lack of any sufficient writing encompassing the alleged agreement is fatal to plaintiff's claim for recovery. In sum, while it seems that Hunt was informed, either verbally or in writing, that CMR elected to "participate" in at least two of the wells, the Gordon Brown and the Thigpen, and payments were made, allegedly in anticipation of agreement on the terms of that participation, no agreement was ever reached. At the very least, no *written* agreement was ever reached. Because of the lack of a written agreement, the obligation of defendants', whose interests were force integrated at Hunt's request, is governed by the force integration statute which requires nonconsenting interest owners to pay their proportionate share only in the event the well reaches payout.[16] *See generally, Wright v. State Oil & Gas Board,* 532 So.2d 567 (Miss.1988).

In the case at bar, it is undisputed that the Thigpen never reached payout. And, defendants, in their motion for summary judgment, contend that neither the Rhoda Lee Brown nor the Gordon Brown ever produced in paying quantities. Plaintiff's sole response to this contention is that it does not know whether the wells reached payout. Because the information as to whether the wells reached payout is within

15. In this regard, and particularly with respect to the payments by CMR, CMR contends that the payments were made in "good faith" based on the anticipation that the parties would ultimately enter into a joint operating agreement. While one might question the plausability of this explanation, it does appear that everyone involved expected that an agreement could be reached.

16. Two arguments advanced by Hunt in support of its claim are (1) that even if there was no express or implied contract, it is nevertheless

plaintiff's ability to determine, its failure to properly controvert, with evidence, defendants' proof that the wells did not reach payout does not preclude summary judgment in favor of defendants on the issue of their liability for payment of the development and operating expenses as to the three wells. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1985). Hunt is, however, entitled to summary judgment on the issue of CMR's liability for payment of its pro rata share of the cost of construction and operation of the gas treatment facility.

### DEFENDANTS' MOTION TO STRIKE AFFIDAVIT

Defendants have moved to strike the affidavit of C. Danny Foster. The court's disposition of the summary judgment motions renders this matter moot.

### DEFENDANTS' APPLICATION FOR REVIEW

By order entered August 17, 1987, the United States Magistrate denied a motion by defendants for leave to amend their answer to assert a counterclaim against Hunt for recovery of the approximately 4.1 million dollars the defendants paid to plaintiff in connection with the development of the gas wells at issue in this case. That ruling is presently before the court on defendants' application for review.

Rule 13 of the Federal Rules of Civil Procedure, which governs counterclaims, provides at subsection (a) that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party,

entitled to recover its expenses for drilling and operation under an unjust enrichment theory, and (2) even if the statute of frauds applies, it should in any event recover the value of services performed. Both arguments, if accepted, would effectively render the force pooling statute a nullity to the extent that it provides for the allocation of costs as between the operator and a nonconsenting owner in the event a force integration is issued by the board. Accordingly, plaintiff's arguments are without merit and must be rejected.

if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim...." Rule 13(f), relied on by the magistrate, states that

> [w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment.

In ruling on defendants' motion, the magistrate considered that defendants, throughout the course of this lawsuit, had caused numerous delays and continuances and had been dilatory in seeking to assert the counterclaim without any showing of "oversight, inadvertence, or excusable neglect." [17] The magistrate further opined that allowing the counterclaim would interject new issues into the lawsuit, necessitating substantial additional discovery, and concluded that the combination of these facts would result in substantial prejudice to plaintiff if the amendment were allowed.

In the court's view, although the magistrate found that there had been no "oversight, inadvertence, or excusable neglect"

—a conclusion with which this court agrees—the court is nevertheless of the opinion that the motion to amend should be granted.[18] The magistrate did not address that part of Rule 13 which provides for allowing the filing of an omitted counterclaim where "justice requires." Here, the counterclaim sought to be asserted is compulsory in nature such that the denial of its allowance will forever bar its assertion. Additionally, from a review of the matters submitted by the parties in connection with the motion for summary judgment, it appears that there has been extensive discovery on the issues regarding defendants' payment of the amounts invoiced by plaintiff and as such, the addition of the counterclaim should not necessitate extensive additional discovery as predicted by the magistrate. In fact, according to defendants, there will be no need for additional discovery. Finally, the addition of the counterclaim does not interject new issues into the case; instead, and as defendants assert, it merely is a logical extension of the affirmative matters which have been previously pled by defendants.[19] Based on

17. The record in this case, as reflected by the magistrate's order and the docket sheet, shows that Hunt filed this action on July 31, 1985. After three extensions of time, defendant responded to the complaint on September 27, 1985. Following an April 5, 1986 production by plaintiff of 56,000 accounting documents in response to defendants' motion for more definite statement, defendants chose to have the documents recopied by their own personnel; this procedure necessitated two amendments to the scheduling order and a continuance of the case from a September 29, 1986 trial calendar. The second amended scheduling order, pursuant to which discovery was to be completed December 15, 1986, was also amended at defendants' request thereby extending the discovery deadline to February 28, 1987. The case was again set for trial for April 27, 1987; defendants moved for a continuance and sought an additional six-month extension of discovery. Both requests were granted with an admonition that *no* further extensions or continuances would be allowed. A fourth amended scheduling order established August 27, 1987 as the deadline for completion of discovery and May 27, 1987 as the date for filing all amendments to pleadings. Defendants' motion to amend to assert the counterclaim, as well as certain affirmative defenses, was filed on May 27, 1987. The magistrate allowed the amendment insofar as it related to the affirmative defenses sought to be added, but denied it as to the counterclaim.

18. The parties disagree as to the applicable standard of review to be applied to the magistrate's ruling. Plaintiffs urge the application of the deferential "clearly erroneous or contrary to law" standard established for review of rulings by the magistrate on nondispositive matters. *See* Fed.R.Civ.Proc. 72(a). Defendants, however, claim that the provisions of Rule 72(b), which apply to rulings on "dispositive motions" and provides for a de novo determination by the court of the magistrate's ruling, governs. A motion to amend to assert an omitted counterclaim is not one of the dispositive matters set forth in Rule 72(b) and is generally considered nondispositive; however, the counterclaim which defendants seek to add is compulsory such that the magistrate's denial of leave to assert that counterclaim is in a sense dispositive since it will forever bar defendants' recovery from plaintiff on that claim. The court therefore is not constrained to be quite as deferential to the magistrate's ruling as it would ordinarily be. *See* 7 J. Moore, *Moore's Federal Practice* ¶ 72.03 (2d ed. 1985).

19. For example, one of defendants' affirmative defenses is as follows: "None of the wells in question produced in paying quantities and therefore, defendants are not liable for any costs associated therewith."

**1390**

the foregoing, therefore, the court is of the opinion that the motion should be granted.[20] At the same time, the court, in granting the relief requested by plaintiff, is relying in part on the representation by defendants that the need for discovery on the matters raised in the counterclaim is minimal, if there is any need at all, and will not unduly delay the proceedings. To lessen any prejudice to plaintiff which may be caused by the allowance of this amendment, the court is of the opinion that to the extent that reasonable discovery is required, that discovery should be completed within forty-five days of the entry of this order and shall be at defendants' expense. Further, the defendants will be granted *no* extensions.

The motions of the parties are granted in part and denied in part as set forth herein.

ORDERED.

**20.** While the parties in their cross motions for summary judgment did touch upon the issue of defendants' ability to recover the monies paid, to the extent that either side actually seeks judgment on this issue, the court views the motions as premature. At the time the motions were filed, and to this day, the counterclaim has been neither filed nor responded to. The court though, having become thoroughly familiar with the facts in this case, entertains some doubt as to the potential for defendants' success on this counterclaim. The court has now concluded that defendants were under no legal obligation to pay any costs associated with the wells or treating facility. However, it is undisputed that defendants made such payments to plaintiff. Though defendants claim the payments were intended to demonstrate their "good faith" in negotiating toward an acceptable agreement with plaintiff, it appears on the facts already presented by the parties that the payments were made by defendants voluntarily, a fact which may undermine the viability of defendants' claim for recovery of those payments. However, the court intends this merely as an observation and will refrain from further comment since the only issue the court now has before it for decision is whether defendants should be allowed to interject a claim for recovery into this lawsuit.