**TYGER CONSTRUCTION COMPANY INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 468–88C, 526–88C, & 90–134C.**

United States Court of Federal Claims.

March 31, 1993.

Randall W. Wulff, San Francisco, CA, for plaintiff. Stephen R. Lowenthal, Farella, Braun & Martel, San Francisco, CA; and Richard L. Beizer and Cameron S. Hamrick, Crowell & Moring, Washington, DC, of counsel. Andrew W. Stephenson, Dunnells, Duvall & Porter, Washington, DC, for John J. Kirlin, Inc.

Richard E. Rice, Washington, DC, with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant. Jeffrey Robbins, Office of the General Counsel, Dept. of Health and Human Services, of counsel.

## OPINION

NETTESHEIM, Judge.

These consolidated construction contract cases come before the court after argument on the motion of plaintiff Tyger Construction Company Inc. ("plaintiff") to dismiss defendant's counterclaims alleging fraud for failure to state claims upon which relief can be granted pursuant to RCFC 12(b)(4). Plaintiff is a South Carolina corporation licensed to conduct business in Maryland. (Except as noted, all references

to plaintiff's second amended complaint, sometimes referred to as "plaintiff's complaint," are to 468–88C; all references to defendant's second amended counterclaim are to No. 526–88C.) In the cases-in-chief, plaintiff seeks recovery of $14,918,144.00 in damages for allegedly unnecessary additional work, work not required by the contract specifications, and delay in the construction of an animal testing facility for the Food and Drug Administration (the "FDA"). In the counterclaims at issue,[1] defendant alleges, pursuant to the False Claims Act, 31 U.S.C. §§ 3729–3733 (1988); the Contract Disputes Act, 41 U.S.C. § 604 (1988); and 28 U.S.C. § 2514 (1988), providing for a special plea in fraud, that plaintiff fraudulently submitted invoices for payment and knowingly made false representations in certified claims submitted to the contracting officer. Defendant asks the court to award the Government the unsupported amount of plaintiff's claims; impose treble damages, civil penalties, costs of this action, as well as costs to the Government attributable to reviewing these claims; and order forfeiture of all claims.

## FACTS

The following facts are largely disputed. Consequently, the court will note when material facts are controverted. Essential background facts originate from plaintiff's second amended complaint in No. 468–88C. However, with respect to defendant's counterclaim allegations, the court will accept as true defendant's factual statements for the purposes of defendant's motion to dismiss. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The court will recite only those facts pertinent to the counterclaims at issue.

Plaintiff is a general contractor in the construction industry. On July 18, 1983 the Department of Health and Human Services awarded Contract No. 131–83–0005 to plaintiff for the construction of an FDA Animal Testing Laboratory ("the project")

---

1. Defendant also filed a contract counterclaim for $10,889,136.00 that is not a subject of plaintiff's motion.

in Beltsville, Maryland.[2] The $27,466,-494.00 lump-sum contract provided for contract completion within three years of the notice to proceed. Plaintiff received the notice to proceed on July 26, 1983.

## I. Masonry construction

As part of the contract specifications, plaintiff was required to construct an exterior brick veneer wall over a cavity metal stud backup system and concrete masonry cavity wall. The specifications called for two back-up systems to provide structural support for the brick walls: light gauge steel framing ("LGSF") and concrete masonry unit walls ("CMU"). Linking these support systems to the building's steel frame would provide support to the brick veneer walls. Plaintiff engaged three subcontractors to assist in constructing these project components: McMillan Masonry, Inc. ("McMillan")—construction of brick veneer and CMU wall; Dominion Applicators, Inc. ("Dominion")—construction of the metal stud backup system, including plastering and drywall; and Ray Wood—installation of the plywood sheathing on the metal stud backup system.

### 1. *LGSF wall backup system*

This portion of the project included vertically aligned metal studs attached by screws or welding to horizontal metal tracks. Horizontal bracing or bridging supported the studs. The tracks were to be attached to the project's steel frame. Contract specifications included the following: 1) All components shall be attached by welding or self-drilling tapping screws; 2) tracks shall be securely anchored to the supporting structure; 3) studs also shall be securely anchored to the flanges or webs of the upper and lower tracks; and 4) bridging rows shall be spaced at 48 inches on center with a minimum of one row at mid-height.

### 2. *Construction disputes*

In 1984[3] a dispute arose concerning the design and construction of the exterior brick. By letter dated September 21, 1984, the FDA notified plaintiff that it had failed to install the bridging or horizontal bracing that supported the metal studs in the LGSF backup system. By letter dated September 27, 1984, plaintiff assured the FDA's resident engineer that Dominion would install the required bracing.[4] Defendant contends that Dominion continued to construct the LGSF backup system without the necessary bridging or bracing.

Defendant alleges that Dominion also failed to use the requisite number of screws to fasten the metal studs to the lower and upper tracks. According to defendant, Dominion frequently fastened the studs to one, rather than both, side of the tracks. Moreover, defendant claims that Dominion also frequently neglected to fasten the studs to both the upper and lower tracks.

In October 1984 Dominion, through plaintiff, requested permission to use spot welding to attach metal studs that were not being fastened by screws. By letter dated October 29, 1984, the FDA denied plaintiff's request. However, in the same letter the FDA approved a continuous weld across the entire stud surface as a means of attachment to the tracks.[5] Defendant

2. An August 16, 1984 contract modification changed the contract number to No. 223–83–9000 and transferred contract responsibility to the FDA.

3. The parties dispute the exact date work began on the exterior brick. Plaintiff claims it began on May 7, 1984. Defendant claims that problems with the exterior brick began by September 1984.

4. Plaintiff disputes the substance and timing of this chronology. Plaintiff maintains that, after commencing construction of the brick veneer, it discovered that the veneer could not be constructed according to the plans and specifications supplied by the FDA. Plaintiff makes no reference to the September 1984 communications between itself and the FDA over the LGSF backup system.

5. In November 1984 the FDA contracted with a private masonry consultant, Dean C. Patterson, to evaluate the brick veneer on metal stud system. Mr. Patterson prepared a report dated December 10, 1984, which recommended remedial repairs on the brick veneer and steel stud backup systems. This report is discussed more fully *infra* at pp. 40–41.

alleges that Dominion did not use any means, including spot or continuous welding, to remedy the failure to attach sufficient screws to secure the studs to the tracks. On December 19, 1984, at an on-site meeting, the FDA's resident engineer advised plaintiff and Dominion that they had not properly attached the studs to the tracks. On December 21, 1984, the FDA confirmed the substance of the on-site meetings in a letter to plaintiff. The letter stated, *inter alia:*

> We have observed that a number of the exterior studs have not been secured to the track (both inside and outside). In lieu of a screw, we will accept a continuous weld the width of the stud. In addition, horizontal bracing has not been provided.

Def's First Amended Counterclaim filed July 6, 1992, ¶ 78.

On January 25, 1985, the parties agreed that Dominion would formulate and submit an alternate method to attach the studs to the tracks. Pursuant to Dominion's June 12, 1985 proposal, on July 24, 1985, the FDA approved horizontal bracing at the stud ends as a means of preventing them from rotating or moving. However, defendant alleges that Dominion never employed any method whatsoever to attach the studs securely to the tracks. Moreover, defendant charges that plaintiff ordered the non-conforming work to continue and actively participated in hiding the uncorrected deficiencies from FDA inspectors. By letter dated March 24, 1987, the contracting officer ordered plaintiff to demolish and reconstruct the brick veneer.

### 3. *CMU wall backup system (including paint)*

All CMU walls, including CMU's used as interior partitions, were to be connected to the project's steel frame, *i.e.*, the project's beams and columns. Anchor straps and ties attached at 16–inch intervals would connect the CMU walls to the frame. The anchor straps would be welded to the frame; the ties, in turn, would be fastened to the anchor straps and mortared into the CMU walls. Contract specifications included the following: 1) Joints adjacent to other materials and spaces around the metal frame and built-in work shall be filled solid with mortar as each course is laid; 2) CMU walls shall be tied to the frame with specified anchor straps and ties, or an approved equal; and 3) ties shall be installed on 16 inch centers. The specifications also required that plaintiff paint the interior CMU walls.[6] The specifications called for plaintiff to apply epoxy block filler to certain CMU walls. Plaintiff alleges that the FDA's architect approved plaintiff's proposed CMU block prior to the installation of the interior CMU walls. Defendant denies this allegation.

### 4. *Construction disputes*

Defendant alleges that plaintiff's masonry subcontractor, McMillan, frequently neglected to tie the CMU walls to the frame as required in the specifications. Defendant ascribes this failure to the lack of column ties at the job site. In a January 25, 1985 letter, the FDA's resident engineer informed plaintiff that ties must be installed on all building columns, as depicted in architectural drawing No. A–52.[7] However, according to defendant, plaintiff and McMillan knowingly continued on a regular basis to construct the walls without the required ties on the columns.

On May 23, 1985, the FDA project engineer advised plaintiff to cease CMU work at column locations until column ties were available. In a letter of the same date, the contracting officer criticized plaintiff's contract management and specifically warned

---

**6.** Some of the background facts in this section derive from plaintiff's complaint, as opposed to the counterclaim, because defendant did not supply such facts in the counterclaim.

**7.** Plaintiff alleges that the parties agreed to certain unspecified repairs pursuant to the Patterson report. (It is unclear whether the Patterson Report dealt with the CMU wall backup system.)

Plaintiff asserts that it began these repairs on January 25, 1985. Plaintiff points to a March 8, 1985 FDA directive purporting to memorialize the parties' repair agreement. Defendant admits that the FDA ordered plaintiff to make certain repairs, but denies that a directive memorialized any new agreement.

plaintiff that failure to install the column ties was causing mortar joint cracking at column sites. Following a May 28, 1985 construction meeting, the FDA's resident engineer documented plaintiff's failure to stop CMU construction pending delivery of the column ties. On June 7, 1985, the contracting officer ordered plaintiff to stop work on the CMU walls when column ties were not available. The contracting officer also warned plaintiff that the FDA would not make further payments for the walls without installation of the column ties. By letter dated September 2, 1987, the contracting officer advised plaintiff that inspections of the recently demolished brick facade revealed that one of the CMU exterior backup walls was cracked and unstable. Accordingly, the contracting officer directed plaintiff to replace or repair and stabilize the CMU wall prior to rebricking. Defendant alleges that the instability of the wall was the direct result of plaintiff's omission of column ties. Defendant alleges that plaintiff continued to improperly install the CMU walls notwithstanding the FDA's repeated complaints and warnings.[8] Moreover, defendant claims that plaintiff's continuing failure to install column ties could not be discovered through visual inspection. Consequently, the FDA did not realize the full extent of the column tie omissions until a CMU wall collapsed on October 15, 1987. Defendant alleges that the wall collapse was a direct result of these omissions. On October 16, 1987, the contracting officer again ordered plaintiff to fasten the CMU walls to the columns, as required by the specifications.

On January 21, 1988, plaintiff submitted a certified claim in the amount of $3,834,513.00 for work on the exterior brick veneer system and repair of the stud backup system.[9] On March 16, 1988, the contracting officer advised plaintiff that she would render a final decision on or before May 22, 1988. By letter dated April 21, 1988, plain-

tiff reduced the amount of its claim to $3,726,028.00. The contracting officer failed to render her final decision prior to May 22, 1988, because the claim had been referred for investigation to the Department of Justice and the Inspector General of the Department of Health and Human Services.

The FDA did not accept the finish of the CMU paint. Consequently, on April 17, 1985, the contracting officer issued directive KO-341 changing the paint specifications and directing plaintiff to apply additional coats of paint in order to achieve an acceptable finish. The parties disagree as to why and when subsequent problems arose. However, it is clear that the new paint on a portion of the CMU walls disbonded, cracked, and peeled. The FDA then ordered plaintiff to remove the CMU wall paint and repaint the walls.

The FDA refused to accept responsibility for the paint's failure to bond. Plaintiff alleges that design defects caused the paint failure. Defendant denies this allegation and asserts that plaintiff's painting subcontractor, BRA, failed to apply the epoxy block filler to CMU walls so designated in the specifications. Moreover, defendant points out that on August 18, 1986, the parties agreed to Modification No. 200 in which plaintiff agreed to accept the sum total of $55,000.00 as an accord and satisfaction for additional costs attributable to the contracting officer's April 1985 directive. On January 15, 1991,[10] plaintiff submitted a certified claim to the contracting officer for $959,755.00 in additional costs for work on the CMU wall paint. The contracting officer denied the claim on May 3, 1991.

## II. Construction consultants

### 1. *The Patterson Report*

As noted above, in November 1984 the FDA hired Dean C. Patterson, P.E., to eval-

---

8. Plaintiff contends that, beginning in early 1985, it repeatedly asked the FDA to implement detailed inspection procedures to insure final acceptance of the CMU wall backup system. Plaintiff also alleges that the FDA had total access to the work site and could have inspected any part of the project during construction.

9. In its counterclaim but not in its amended answer, defendant alleges a date of January 12, 1988.

10. Defendant alleges January 17, 1991.

uate the brick veneer system and to suggest remedial repairs. Defendant alleges that the December 10, 1984 Patterson Report and the recommendations contained therein were confined solely to plaintiff's alleged failure to tie the brick facade to the metal stud backup system. The parties dispute whether the Patterson Report's recommendations constituted additional work not required by the specifications. The parties agree that, as a consequence of the Patterson Report, in early 1985 the FDA ordered and plaintiff performed various repair work to the exterior brick veneer system. Plaintiff claims that it finished this repair work in September 1985. Defendant rejoins that the required repair work was never completed, let alone properly performed.

### 2. The Gensert Report

In April 1986 the FDA hired another consultant, Gensert, Bretnall, Bobel, Inc. ("Gensert"), to inspect and evaluate the exterior brick veneer system.[11] In a report dated October 13, 1986, Gensert evaluated the exterior brick veneer system. The report recommended, *inter alia*, stiffening the building's frame and the metal studs, replacing the brick veneer, and installing control joints on interior CMU partitions. By letter dated November 14, 1986, the FDA made various "comments" to Gensert concerning the report. Gensert responded to these "comments" by letter dated February 2, 1987. On February 20, 1987, the FDA transmitted a copy of the October 1986 report to plaintiff, along with Gensert's computer calculations.

Defendant does not describe the import of the Gensert Report or relate the FDA's comments on the report. Plaintiff asserts that the Gensert Report criticized the FDA's project design and attributed the distress in the exterior brick veneer system to deficiencies in the structural design. Moreover, plaintiff alleges that the FDA

misrepresented to plaintiff that the report only criticized the brick veneer's construction, but not its design. Plaintiff also complains that the FDA delayed releasing the report to plaintiff, while pressuring Gensert to change its evaluation.

### 3. The Wiss Report

In October 1986 the FDA contracted with a third consultant, Wiss, Janney, Elstner Associates, Inc. ("Wiss"), to evaluate the design and construction of exterior masonry wall system. On March 16, 1987, Wiss issued its report finding construction deficiencies in the system, including a lack of horizontal bracing and stud attachments in the LGSF wall backup system. The Wiss Report further stated that without proper mid-height bracing or end attachments, buckling could occur at loads significantly below anticipated design levels. The report noted that these existing construction deficiencies in the exterior walls could cause enough deterioration to compromise the brick veneer's structural safety. Wiss did not recommend the ameliorative measures listed in the Gensert Report. In conclusion, the Wiss Report recommended demolition and reconstruction of the exterior brick veneer system. On March 24, 1987, the FDA ordered plaintiff to implement the Wiss Report's recommendations.[12] Wiss personnel observed the demolition of the LGSF wall backup system. Wiss determined that plaintiff failed to provide horizontal bracing or bridging in 44.3 percent of the 255 bridging locations inspected. Wiss further determined that plaintiff failed to secure metal studs to tracks in 61 percent of the 7,171 screw locations inspected. On December 15, 1987, plaintiff completed correction of the LGSF deficiencies. On December 31, 1987, plaintiff completed the removal and replacement of the exterior brick facade.

Following the collapse of the CMU wall, Wiss prepared a report on CMU walls. In

---

11. Defendant disputes this characterization of Gensert's mission, but offers no alternative description of the scope of Gensert's contract with the FDA. Similarly, defendant admits only that it hired Gensert in 1986, but demurs as to the specific month.

12. The parties' submissions give varying dates for the demolition order. Some submissions proffer June 1987, while others proffer March 24, 1987.

a report dated July 28, 1988, Wiss noted construction deficiencies in CMU walls throughout the facility. Wiss recommended that the CMU walls should not be considered as structural elements. Wiss further recommended remedial bracing. By letter dated January 18, 1989, the contracting officer directed plaintiff to install remedial bracing. On August 2, 1989, plaintiff completed installation of the remedial bracing.

### III. Delays

In order to fully explicate defendant's delay fraud claim, the court must look to plaintiff's complaint. Except as noted, the following facts are controverted by defendant. As extended by six contract modifications, the project completion date was September 8, 1986. Plaintiff alleges that by January 1985 it had completed construction of the exterior brick veneer system. After performing the repairs ordered by the FDA pursuant to the Patterson Report, plaintiff contends that the exterior brick veneer was completed by September 1985. Plaintiff further alleges that by February 28, 1986, the entire project was substantially complete. Plaintiff claims that the FDA was dilatory in issuing its order to demolish and reconstruct the brick veneer and that, in any event, the repairs were necessitated solely because of the FDA's design errors. Plaintiff asserts that the combination of the June 1987 order and additional work ordered by the FDA on the project's mechanical system delayed the project through September 1990. Plaintiff pertinently alleges that the FDA issued numerous "punch lists" of items to be completed prior to acceptance. Many of the "punch list" items were necessitated solely due to the FDA's inadequate project design, according to plaintiff. Plaintiff alleges that the FDA's inadequate design and dilatory remedial efforts caused plaintiff to incur damages in performing work not required by the contract. On February 1, 1991, plaintiff submitted a certified claim of $3,233,109.00 and requested an increase in the time of performance to 1,781 days.[13] On May 7, 1991, the contracting officer denied plaintiff's claim.

Defendant denies most of these allegations. By February 1986, defendant notes, the FDA had withheld progress payments totalling $1,400,000.00 pending project completion.[14] Defendant acknowledges that the contract completion date was September 8, 1986, and that it ordered plaintiff to demolish and reconstruct the exterior brick veneer. However, defendant rejects any responsibility for the work occasioned by its ordering the demolition, alleging that plaintiff failed to comply with contract specifications.

### IV. Fraud counterclaim allegations

On May 23, 1991, defendant filed the eight fraud counterclaims that are the subject of this motion. The counterclaims fall into four subject categories: false invoicing; masonry claim (LGSF, CMU walls, and brick veneer); delay claim; and CMU paint claim. Defendant brings these counterclaims pursuant to two statutes: the False Claims Act, 31 U.S.C. §§ 3729–3733 (1988) (the "FCA"), and the Contract Disputes Act, 41 U.S.C. § 604 (1988) (the "CDA"). Each of the above subject categories, except for the false invoicing counterclaim, is the subject of one FCA and one CDA counterclaim. The false invoicing counterclaim is the subject of an FCA counterclaim only. Defendant pleads the factual substance of all the fraud counterclaims in the FCA allegations. Thus, the CDA counterclaims are additional claims based on the same operative facts as the FCA counterclaims. Finally, defendant sets forth a special plea in fraud counterclaim, pursuant to 28 U.S.C. § 2514 (1988), appli-

---

**13.** Defendant alleges that a claim was submitted on January 31, 1991, totalling $3,673,733.00 and requesting a time extension from September 8, 1986, to September 28, 1986. Plaintiff alleges that these damages had increased to $4,121,-953.00 by the date of plaintiff's first amended complaint.

**14.** Plaintiff alleges that in February 1986 the FDA had approved expenditures equalling 98.3 percent of total contract billings.

cable to all the subject categories. The court will discuss the counterclaim allegations serially.

### 1. *False invoicing in the LGSF system; first counterclaim—FCA*

Defendant alleges pursuant to the FCA that from June 29, 1984, to October 21, 1985, plaintiff knowingly presented nine false or fraudulent payment invoices for work on the LGSF backup system to the FDA. Defendant specifically alleges that plaintiff knowingly made, used, or caused to be made false statements and misrepresentations to get these false invoices paid. Defendant contends that the FDA paid the invoices based on plaintiff's statements that plaintiff had completed 100 percent of the LGSF work on the following dates and at the following locations:

| Invoice Date | Location of Work |
|---|---|
| June 29, 1984 | Ground Floor BLR |
| August 31, 1984 | First Floor Building 2 |
| " | Ground Floor Building 2 |
| " | Second Floor Building 2 |
| " | Third Floor Building 2 |
| September 12, 1985 | First Floor Building 3 |
| " | Second Floor Building 3 |
| " | Third Floor Building 3 |
| October 21, 1985 | P2 & P3 |

### 2. *False invoicing in the CMU walls; first counterclaim—FCA*

Defendant alleges that from April 27, 1984, to May 28, 1986, plaintiff knowingly presented 28 false or fraudulent payment invoices for work on the CMU walls to the FDA. Defendant specifically alleges that plaintiff knowingly made, used, or caused to be made false statements and misrepresentations to get these false invoices paid. Defendant contends that the FDA paid the invoices based on plaintiff's statements that plaintiff had completed 100 percent of the CMU wall work on the following dates: [15]

| Invoice Date | Location of Work |
|---|---|
| April 27, 1984 | no location was identified |
| June 1, 1984 | |
| June 29, 1984 | |
| July 30, 1984 | |
| August 31, 1984 | |
| September 21, 1984 | |
| November 2, 1984 | |
| December 10, 1984 | |
| January 16, 1985 | |
| February 22, 1985 | |
| March 11, 1985 | |
| April 9, 1985 | |
| May 9, 1985 | |
| June 10, 1985 | |
| July 17, 1985 | |
| August 19, 1985 | |
| September 12, 1985 | |
| September 26, 1985 | |
| October 21, 1985 | |
| November 20, 1985 | |
| December 23, 1985 | |
| January 14, 1986 | |
| February 14, 1986 | |
| March 12, 1986 | |
| March 18, 1986 | |
| April 2, 1986 | |
| April 29, 1986 | |
| June 6, 1986 | |

According to defendant, the CMU work could not have been 100 percent complete on the dates specified because plaintiff failed to install column ties as required in the specifications. Defendant alleges that its payment to plaintiff of the false LGSF and CMU invoices damaged the FDA through loss of interest on the payments advanced and the necessity of hiring Wiss to investigate the false statements.

### 3. *Masonry claim; second and third counterclaims—FCA/CDA*

Defendant alleges that on January 12, 1988, plaintiff submitted a false or fraudulent claim to the contracting officer. The claim requested reimbursement for $3,834,-513.00 in costs associated with the demolition and reconstruction of the brick veneer cavity wall system. Defendant specifically alleges that plaintiff knowingly made false

---

**15.** Defendant's counterclaim is silent on the dates; however, defendant included this information in a brief in response to plaintiff's motion to dismiss. *See* Def's Br. filed October 2, 1992, at 6 n. 6. The court allows the amendment, the interest of justice favoring the result.

representations in an effort to get the claim paid or approved. According to defendant, plaintiff generally cannot support the amount of the claim because plaintiff failed to comply with contract specifications and because plaintiff failed to correct construction deficiencies in a timely manner. In particular, defendant's counterclaim cites the following, including statements made by plaintiff in the January 12, 1988 masonry claim, as evidence of knowing misrepresentations:

12[7]. On page 2 of the Original Masonry Claim ... [plaintiff] misrepresents as follows—

... [Plaintiff] substantially complied with the FDA's defective specifications.... [Ellipses in original.]

None of the alleged design defects that ... [plaintiff] asserts in its claim would, if proved, excuse ... [plaintiff] for its failure to comply with the Contract specifications. The representation that ... [plaintiff] substantially complied with the Contract specifications is false.

128. On page 3 of the Original Masonry Claim ... [plaintiff] misrepresents as follows—

[T]he FDA's failure to make timely objection to or rejection of alleged defective performance until more than a year after substantial completion of repairs called for by the Paterson [sic] recommendations ... [ellipses in original] constitutes constructive acceptance of ... [plaintiff's] performance....

The representation that the FDA failed to make timely objection to ... [plaintiff's] defective performance is false. As set forth in [numerous] ... paragraphs [16] above, the Government made repeated and timely objections to ... [plaintiff's] defective performance during the period September 21, 1984, through June 7, 1985.

129. On pages 28–29 of the Original Masonry Claim ... [plaintiff] misrepresents as follows—

[The Steel stud back-up] system was in plain view at time in 1984 when Patterson made his investigation for the FDA.... [Ellipses in original.] Repair to the stud system at that point in the project, December 1984, could have been easily implemented. Instead, the FDA procrastinated for over two years to ... [plaintiff's] ultimate detriment.

The representation that the FDA failed to advise ... [plaintiff] to repair the stud back-up system in December 1984, is false. As set forth in paragraphs 73 and 74 above, the Government specifically advised ... [plaintiff] at that time to attach the metal studs to the tracks with the requisite screws or welding and to install the required bridging or horizontal bracing.

Def's First Amended Counterclaim, filed July 6, 1992, ¶¶ 127–129. Defendant alleges that not only did plaintiff receive timely notice of the construction deficiencies, but plaintiff thereupon failed to correct and, in fact, actively concealed the objected-to deficiencies.

4. *Delay claim; fourth and fifth counterclaims—FCA/CDA*

Defendant alleges that on January 31, 1991, plaintiff filed a false or fraudulent claim with the contracting officer. The claim requested $3,673,333.00 as reimbursement for costs that plaintiff incurred as the result of alleged delays and additional work caused by design deficiencies in the plans and specifications. Plaintiff also requested a time extension for contract completion from September 8, 1986, to September 28, 1990. Defendant specifically alleges that plaintiff made knowing misrepresentations and false statements in this claim in order to induce the FDA to pay or approve payment.

Generally, defendant alleges that plaintiff is unable to support this claim because the masonry construction did not comply with the specifications. In particular, defendant cites the following, including plaintiff's statements in its January 31, 1991

---

**16.** Unfortunately, defendant's paragraph numeration was not consistently modified between its second and third amended answers.

delay claim, as evidence of knowing misrepresentations:

139. On page 2 of the Delay Claim ... [plaintiff] misrepresents as follows—

[O]n February 28, 1986, ... the Project was substantially complete.

The representation that ... [plaintiff] had substantially completed performance of the Contract by February 28, 1986, is false. At that time the Facility as constructed by ... [plaintiff] was grossly defective and unsafe because of ... [plaintiff's] failure to comply with the Contract requirements in performing the work.

140. On page 4 of the Delay Claim ... [plaintiff] misrepresents as follows—

[T]he mere fact that ... [plaintiff] substantially completed the Project more than six months prior to the required Contract completion date demonstrates that the original construction schedule was feasible and that but for numerous design deficiencies which caused delay, the Project would have been completed prior to the Contract completion date.

None of the alleged design deficiencies that ... [plaintiff] asserts in its claim would, if proved, excuse ... [plaintiff] for its failure to comply with the Contract specifications. The representation that [plaintiff] ... substantially completed the Facility more than six months prior to the required Contract completion date, is false.

Def's First Amended Counterclaim filed July 6, 1992, ¶¶ 139–40. Defendant alleges that plaintiff did not complete corrective work on the LGSF exterior wall back-up system and the CMU walls until on or about August 2, 1989. Defendant attributes the alleged failure to substantially complete work on the project by September 28, 1990, to defective construction.

5. *CMU paint claim; sixth and seventh counterclaims—FCA/CDA*

Defendant alleges that on January 17, 1991, plaintiff filed a false or fraudulent claim with the contracting officer. The claim requested $959,775.00 as reimbursement for costs that plaintiff allegedly incurred due to FDA directives modifying specifications and increasing the scope of work. Generally, defendant alleges that plaintiff's

CMU Paint Claim ignores the documented failure of ... [plaintiff's] subcontractor ... to apply epoxy block filler to the CMU walls designated to receive such in the Contract, and further ignores the written agreement ("Modification No. 200") dated August 18, 1986, by which ... [plaintiff] agreed to accept $55,000[.00] as payment for any additional costs attributable to the directive ("KO–341") of the Government's contracting officer dated April 17, 1985, changing the paint specifications....

Def's First Amended Counterclaim filed July 6, 1992, ¶ 148.

Additionally, defendant alleges that plaintiff cannot support the CMU paint claim because plaintiff's paint subcontractor made an unauthorized unilateral substitution of a vinyl block filler instead of the specified epoxy block filler. This unilateral substitution caused the paint to delaminate from the CMU walls. Moreover, defendant alleges (although the allegation is more properly termed an argument) that Modification No. 200 constituted an accord and satisfaction for any additional costs imposed in April 1985 by directive KO–341.

In particular, defendant cites the following, including plaintiff's statements in the January 17, 1991 paint claim, as evidence of knowing misrepresentations:

150. On page 1 of the CMU Paint Claim ... [plaintiff] misrepresents as follows—

The FDA ... [ellipses in original] directed ... [plaintiff] to apply additional block filler and paint to achieve the desired result.

After ... [plaintiff] added the additional filler and paint, the CMU walls began cracking in certain locations.

The representation that ... [plaintiff] added the additional filler is false and fraudulent because ... [plaintiff] knows that the filler was not added.

151. On pages 1–2 of the CMU Paint Claim ... [plaintiff] misrepresents as follows—

> The failure of the CMU walls and paint can be attributed to a number of causes principally stemming from design errors.

....

152. On page 9 of the CMU Paint Claim ... [plaintiff] misrepresents as follows—

> [T]he FDA should bear the increased cost for application of the superior and modified paint system.

....

153. On page 9 of the CMU paint claim ... [plaintiff] misrepresents as follows—

> After the modified paint system specified by the FDA was applied, the CMU walls began to crack and the paint began to crack and peel.

....

154. On page 16 of the CMU Paint Claim ... [plaintiff] misrepresents as follows—

> After ... [plaintiff] applied the FDA-approved modified paint system, the paint on the CMU walls began to crack in places and to peel in others.

Def's First Amended Counterclaim filed July 6, 1992, ¶¶ 150–54. Defendant alleges, as in the previous counterclaims, that plaintiff cannot claim design defects when plaintiff allegedly knows that the painting subcontractor failed to apply the epoxy block filler. Defendant asserts that, in any event, none of the purported design errors would cause delamination. As to ¶ 152 defendant alleges (more properly, argues) that, because plaintiff knew that Modification No. 200 settled any increased cost attributable to KO–341, any request for reimbursement is fraudulent. Moreover, defendant alleges that, because plaintiff knew that the subcontractor failed to use the proper epoxy paint system, plaintiff's statement that the "specified" or "FDA-approved" paint had been applied is fraudulent.

6. *Special plea in fraud; eighth counterclaims—28 U.S.C. § 2514*

Defendant alleges that plaintiff "practiced or attempted to practice a fraud against the United States in the proof, statement, establishment, or allowance of its claims under its Contract with the United States." Def's First Amended Counterclaim filed July 6, 1992, ¶ 160. Accordingly, defendant requests that the court enter judgment of forfeiture for all of plaintiff's claims.

V. Status of plaintiff's cases and defendant's counterclaims

1. *Case No. 468–88C*

On August 8, 1988 plaintiff filed a complaint in case No. 468–88C containing two counts relating to the exterior brick veneer wall system: defective specifications and breach of contract. Plaintiff subsequently amended its complaint on June 13, 1991, with the following five claims: 1) brick (exterior brick veneer); 2) ceiling paint; 3) CMU wall paint; 4) mechanical; and 5) delay and related expenses. The amended complaint stated three causes of action: 1) breach of contract; 2) cardinal change; and 3) fraud and negligent administration. Plaintiff prayed for damages in excess of $12,932,935.00 plus interest, costs, and attorneys' fees. On April 17, 1992, plaintiff filed a second amended complaint appealing the contracting officer's final decision denying plaintiff's delay claim, her assessment of $8,495,000.00 in liquidated damages, and her final decision on the FDA's claim in the amount of $2,394,136.05.

2. *Case No. 526–88C*

On September 6, 1988, plaintiff filed a complaint in case No. 526–88C on behalf of itself and Dominion. The complaint contained five counts pleading additional costs for construction of control joints, drywall, plaster ceilings, and exterior cement plastic soffits. The fifth cause of action appealed the contracting officer's decision that plaintiff owed the FDA between $500,000.00 and $1 million for materials substitutions. An amended complaint filed August 24, 1989, added a sixth count appealing the contract-

ing officer's March 20, 1989 decision that plaintiff owed the FDA $6,524,772.00 for unauthorized substitution of a ceiling suspension system, ceiling demolition, ceiling consultants, liquidated damages, and credits. On September 5, 1989, defendant filed its first amended answer to the amended complaint. The answer contained a contract counterclaim based on the contracting officer's decision described in plaintiff's sixth cause of action.

On May 23, 1991, defendant filed a second amended answer and first amended counterclaim. Defendant amended the contract counterclaim to include additional expenses allegedly required by plaintiff's defective performance and the contracting officer's May 23, 1991 final decision that plaintiff owed the FDA $10,889,136.00, plus interest. Defendant also added the eight fraud counterclaims at issue.

On June 13, 1991, plaintiff filed a second amended complaint praying for a total of $516,417.00, plus interest, costs, and attorneys' fees. The complaint added one count for Dominion's extended overhead and increased direct costs.

By stipulation filed on January 11, 1993, and partial judgment ordered by the court on January 12, 1993, all parties agreed to the dismissal with prejudice of all claims of plaintiff for the benefit of Dominion. The stipulation expressly excluded any damages asserted by plaintiff on its own behalf in case No. 526–88C. Consequently, plaintiff still prays for $130,430.00 in case No. 526–88C. On August 14, 1992, plaintiff filed an answer to the first amended contract counterclaim.

### 3. *Case No. 90–134C*

On February 9, 1990, plaintiff filed a complaint in case No. 90–134C on behalf of itself and its mechanical subcontractor, John J. Kirlin, Inc. The complaint alleged additional direct costs as a result of the FDA's failure to accept certain heating, ventilation, and air conditioning ("HVAC") components. Plaintiff prayed for $787,-051.00, plus interest, costs, and attorneys'

fees. In an amended complaint filed June 13, 1991, plaintiff reworked these allegations into two causes of action: equitable adjustment and denial of claims. The reworked damages totalled $1,854,779.00.

These consolidated cases were reassigned this judge by order entered on January 25, 1993, before argument on plaintiff's motion to dismiss defendant's first amended counterclaim was held.

### DISCUSSION

■ Plaintiff requests dismissal of all eight of defendant's counterclaims pursuant to RCFC 12(b)(4) for failure to state claims upon which relief may be granted. In a supplemental motion filed on September 29, 1992, plaintiff moved to dismiss portions of defendant's first amended fraud counterclaim based on the statute of limitations. The statute of limitations is jurisdictional in the Court of Federal Claims. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957) (discussing this court's predecessor, the Court of Claims); *Hart v. United States*, 910 F.2d 815, 817, 818 (Fed.Cir. 1990); *see United States v. Mottaz*, 476 U.S. 834, 841, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986). The rationale is that, in derogation of the sovereign's immunity, Congress conferred jurisdiction on the court to entertain certain claims and that no others could be asserted against the Government, including time-barred claims. Although plaintiff did not expressly move pursuant to RCFC 12(b)(1) (subject matter jurisdiction), the court will treat the supplementary motion as a motion under this rule.

■ The court has accepted as true all well-pleaded allegations in defendant's amended counterclaims. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).[17] Moreover,

in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of

---

**17.** Certain facts must derive from the complaint to the extent that defendant failed to elaborate

on certain aspects of the project and contract at issue.

the complaint should be construed favorably to the pleader....

*Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (citing *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 101–02 (footnote omitted); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir.1991); *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988). Even in ruling on a jurisdictional motion, the court must consider whether the "facts reveal any possible basis on which the nonmovant might prevail." *W.R. Cooper Gen. Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed. Cir.1988).

Many of the legal issues relevant to deciding this motion apply to more than one counterclaim. Each counterclaim, however, must stand or fall on its own sufficiency. Consequently, the court will address each counterclaim separately. To the extent that a legal issue applies to more than one counterclaim, the overriding law involved will be discussed once and then applied to each counterclaim individually.

■ The court's task is limited in reviewing the sufficiency of a complaint. The issue is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. at 236, 94 S.Ct. at 1686. In other words, the court must not confuse requirements of pleading with requirements of proof. In this case, therefore, the fact that any of defendant's claims survives this limited review does not necessarily portend the ultimate success of defendant's fraud counterclaims.

## I. First counterclaim: false invoicing

The court first considers plaintiff's jurisdictional challenge before addressing its other arguments. *See Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946) (holding, in part, that a motion to dismiss for failure to state a claim may be decided only after finding subject matter jurisdiction). Prior to 1986 the FCA provided for a six-year statute of limitations "from the date the violation is committed." Pub.L. No. 97–258, 96 Stat. 979 (1982), *previously codified at* 31 U.S.C. § 3731(b) (1982). The 1986 amendments retained this language in full, but added another subsection:

(2) [A civil action may not be brought] more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed....

Pub.L. No. 99–562, § 5, 100 Stat. 3158 (1986), *codified at* 31 U.S.C. § 3731(b) (1988).[18] Accordingly, the threshold issue to be addressed is whether the statute of limitations contained in 31 U.S.C. § 3731(b) bars any of the more than 30 invoices at issue in this counterclaim. In order to answer this question, the court must first decide two related questions: whether the 1986 amendments to the FCA should be applied retroactively and, if not, when the pre–1986 FCA limitations period began to run.

### 1. *Retroactive application of the 1986 FCA amendments*

If the 1986 amendments apply retroactively to the invoices submitted during 1984–1986, plaintiff's invoices may be the subject of a timely FCA action and subject to increased damages. If the amendments do not apply retroactively, some of plaintiff's invoices may be time barred, and the amount of the penalty will be $2,000.00, instead of $5,000.00–$10,000.00, per violation and the damages will not be trebled. Plaintiff argues that a presumption exists against retroactive application of legislation, pointing to *Bowen v. Georgetown*

---

**18.** The 1986 amendments also modified the provisions governing the standard for liability, damages, and penalties. In summary, these amendments specifically defined the *mens rea* necessary for FCA liability and provided for increased damages and penalties. Significant to the court's later discussion, the FCA currently provides that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(3).

*University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Citing *Union Manufacturing Co. v. International Trade Commission,* 781 F.2d 186 (Fed. Cir.1985), defendant rejoins that this circuit has carved out an exception when retroactivity of a statute of limitations is at issue.

Unfortunately, the Supreme Court has not yet resolved the nearly 20 year-old debate over retroactive application of legislation. The two landmark cases, *Bowen* and *Bradley v. School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), come to vastly different, if not contradictory, conclusions. In *Bradley* the Supreme Court, ruling on the applicability of a newly-enacted attorneys' fees statute, held that

> a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary.
>
> ....
>
> Accordingly, we must reject the contention that a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature....

416 U.S. at 711, 715, 94 S.Ct. at 2016, 2018 (footnote omitted).

This presumption in favor of retroactivity is consistent with defendant's position. Indeed, the issue would be neatly decided if it were not for the following language from *Bowen* whereby the Court addressed retroactive application of rulemaking under the Medicare Act: "Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result...." 488 U.S. at 208, 109 S.Ct. at 471

(citing cases). More recently, in *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* the Supreme Court reiterated that "[t]he starting point for interpretation of a statute 'is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive'...." 494 U.S. 827, 835, 110 S.Ct. 1570, 1575, 108 L.Ed.2d 842 (1990) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). The Court noted the "apparent tension" between *Bradley* and *Bowen* and maintained that "[w]e need not in this case, however, reconcile the two lines of precedent ... because under either view, where the congressional intent is clear, it governs...." 494 U.S. at 837, 110 S.Ct. at 1577.[19]

The Federal Circuit recently spoke to the retroactivity issue in *Sargisson v. United States,* 913 F.2d 918 (Fed.Cir.1990). In *Sargisson* the court refused retroactive application of a military statute. In analyzing the case law, the court remarked on the "irreconcilable conflict" between *Bowen* and *Bradley* and held that "[w]e prefer the longer-standing rule that retroactivity is not presumed." 913 F.2d at 922–23. As of the date of this opinion, the Third, Fourth, Sixth, Eighth, Tenth, and Federal Circuits have chosen the *Bowen* legislative retroactivity presumption. For its part the Claims Court followed the Federal Circuit's lead regarding retroactivity. *See, e.g., Mai v. United States,* 22 Cl.Ct. 664, 667–68 (1991), *aff'd,* 975 F.2d 868 (Fed.Cir.1992) (unpubl.) (holding that the court will not retroactively apply a military pay statute).

Few appellate courts have addressed retroactivity of the FCA amendments.[20] In

---

19. In a concurring opinion Justice Scalia chastised the Court for not explicitly overruling *Bradley.* 494 U.S. at 841, 110 S.Ct. at 1578.

20. A number of district courts have concluded that the 1986 FCA amendments should be applied retroactively with respect to the standard of liability or damages/penalty provisions. *See, e.g., United States ex rel. McCoy v. California Medical Review, Inc.,* 723 F.Supp. 1363 (N.D.Cal. 1989); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Acci-*

*dent Ins. Co.,* 721 F.Supp. 1247 (S.D.Fla.1989); *United States v. Pani,* 717 F.Supp. 1013 (S.D.N.Y. 1989); *Kelsoe v. Federal Crop Ins. Corp.,* 724 F.Supp. 448 (E.D.Tex.1988); *United States v. Board of Educ.,* 697 F.Supp. 167 (D.N.J.1988); *United States v. Oakwood Downriver Medical Ctr.,* 687 F.Supp. 302 (E.D.Mich.1988); *United States v. Ettrick Wood Prods., Inc.,* 683 F.Supp. 1262 (W.D.Wis.1988); *Gravitt v. Gen. Elec. Co.,* 680 F.Supp. 1162 (S.D.Ohio), *appeal dismissed,* 848 F.2d 190 (6th Cir.), *cert. denied,* 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988); *Unit-*

*United States v. Murphy*, 937 F.2d 1032 (6th Cir.1991), the Sixth Circuit held that with respect to acts alleged to have been committed prior to October 1986, FCA liability must be determined with reference to the pre–1986 FCA liability provisions. *Id.* at 1037–38.

Only one trial court has addressed the even narrower issue of the retroactivity of the 1986 FCA amendments to the statute of limitations. In *United States v. Target Rock Corp.*, No. CV–90–4414, 1992 WL 157677 1992 U.S.Dist.LEXIS 9858 (E.D.N.Y. June 30, 1992) (unpubl.), a federal district court surveyed the applicable case law and ruled that the 1986 amendments to the FCA, including the modified statute of limitations, could have no retroactive effect. The court barred "[a]ll claims that would have been timely only by virtue of the 1986 amendments to the FCA...." *Id.*, 1992 WL 157677, at *7, 1992 U.S.Dist.LEXIS 9858, at *26–27. *Target Rock* is in opposition to the Claims Court decision in *SGW, Inc. v. United States*, 20 Cl.Ct. 174, 178–80 (1990). *SGW*, however, did not address specifically the retroactivity of the post–1986 FCA statute of limitations.[21] The court did not discuss the *Bowen* or *Kaiser Aluminum* cases representing the Supreme Court's most recent pronouncements on legislative retroactivity. Instead, the Claims Court relied on *Bradley*, presumed statutory retroactivity, and applied the FCA's liability provisions retroactively.

Given the weight of the Federal Circuit and other authority addressing legislative retroactivity in general, this court is constrained to follow *Bowen* and *Kaiser Aluminum* and presume that the 1986 amendments to the FCA do not apply retroactively unless the language of the amended statute requires such a result. *See Bowen*, 488 U.S. at 208, 109 S.Ct. at 471. Because

*Kaiser Aluminum* intimates that courts should examine congressional intent, the court will also examine the legislative history of the FCA to see if a clear congressional intent existed to apply the statute retroactively. *See* 494 U.S. at 837–40, 110 S.Ct. at 1577–78.

■ Neither the plain language of the 1986 amendments nor their legislative history speaks to the retroactivity issue, let alone requires retroactive application. The legislative history, though comparatively more expansive than the statutory language, offers little guidance concerning retroactive application of the 1986 FCA amendments. For its part the Senate Report noted:[22]

> [T]he subcommittee added a modification of the statute of limitations to permit the government to bring an action within 6 years of when the false claim is submitted (current standard) or within 3 years of when the Government learned of a violation, whichever is later. The subcommittee agreed that because fraud is, by nature, deceptive, such tolling of the statute of limitations is necessary to ensure the Government's rights are not lost through a wrongdoer's successful deception.

S.Rep. No. 345, 99th Cong., 2d Sess. 15 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5280. The report goes on to summarize, subsection by subsection, the substantive changes or additions in the law. As to 31 U.S.C. § 3731(b), the report states that the bill includes "an explicit tolling provision on the statute of limitations.... The statute does not begin to run until the material facts are known by an official within the Department of Justice with authority to act in the circumstances." *Id.* at 30, 1986 U.S.C.C.A.N. at 5295. These passages offer little, if any, support for a

---

ed *States v. Hill*, 676 F.Supp. 1158 (N.D.Fla. 1987). All of these decisions applied a *Bradley* retroactivity presumption. This makes sense given that all but three of these decisions were rendered prior to *Bowen* and all of them predate *Kaiser Aluminum*. As such, these decisions relied on law of questionable viability. At least one district court has refused to give retroactive effect to the FCA liability and damage provi-

sions. *See United States v. Bekhrad*, 672 F.Supp. 1529 (S.D.Iowa 1987).

21. The court did address the statute of limitations as to several CDA claims.

22. The Senate bill was passed in lieu of the House bill.

retroactive application of the 1986 FCA amendments. Given the non-retroactivity presumption of *Bowen* and *Kaiser Aluminum*,[23] the court must conclude that the 1986 FCA amendments are to be applied prospectively from the October 27, 1986 enactment date. The invoices at issue, dated April 27, 1984, to June 6, 1986, are all subject to the pre–1986 statute of limitations contained in Pub.L. No. 97–258, 96 Stat. 979 (1982), *previously codified at* 31 U.S.C. § 3731(b) (1982).

### 2. *To toll or not to toll*

■ The pre–1986 statute of limitations provides that "a civil action under section 3730 of this title must be brought within 6 years from the date the violation is committed." 31 U.S.C. § 3731(b) (1982). Defendant filed the instant counterclaims on May 23, 1991. Therefore, plaintiff argues, the plain import of the statutory language bars any counterclaim allegation for invoices dated prior to May 23, 1985.[24] Defendant rejoins that the statute of limitations does not begin to run until the counterclaimant reasonably discovers the underlying facts. Because plaintiff allegedly covered up the construction deficiencies in the LGSF and CMU portions of the project, defendant contends that it did not know or reasonably know until sometime in 1987 when the CMU wall collapsed and Wiss discovered the LGSF screw and bracing deficiencies. This accrual date would make all the invoices timely. Defendant alternatively argues that the counterclaim did not accrue until the FDA made final payment under the contract.

The court begins with the statutory language in the pre-amendment FCA. The statute provided that: "A civil action under section 3730 of this title must be brought within 6 years from the date the violation is committed." 31 U.S.C. § 3731(b) (1982). Unfortunately, this language is not a model of clarity. The quoted language begs the question: When is the violation committed for purposes of the FCA? Furthermore, the quoted language offers no guidance as to whether equitable tolling should be applied to the limitations period. Because the court resolves the issue on the basis of equitable tolling, determining when the violation is committed need not be resolved.

The Supreme Court has held that " '[s]tatutes of limitation sought to be applied to bar rights of the Government must receive a strict construction in favor of the Government....' " *Badaracco v. Comm'r*, 464 U.S. 386, 391, 104 S.Ct. 756, 761, 78 L.Ed.2d 549 (1984) (quoting *E.I. Dupont de Nemours & Co. v. Davis*, 264 U.S. 456, 462, 44 S.Ct. 364, 366, 68 L.Ed. 788 (1924) (citation omitted)). The Court of Claims, in particular, expressed a preference for tolling the statute of limitations until the aggrieved party knew or should have known of the facts giving rise to the cause of action. *Japanese War Notes Claimants Ass'n v. United States*, 178 Ct. Cl. 630, 634, 373 F.2d 356, 358–59, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). Indeed, fraudulent concealment provides a major justification for tolling a statute of limitations. As the court stated in *Japanese War Notes:*

> In certain instances the running of the statute will be suspended when an accrual date has been ascertained, but plaintiff does not know of his claim. Ignorance of rights which should be known is not enough.... Plaintiff must either show that defendant has concealed its acts

---

**23.** Defendant submits that *Union Manufacturing* mandates a different retroactivity test when a statute of limitations is at issue. First, that decision pre-dates the *Bowen, Kaiser Aluminum,* and *Sargisson* decisions, all of which presume prospective application of legislative enactments. Second, the court in *Union Manufacturing* relied on the *Bradley* test, the continued validity of which is in doubt. Finally, *Union Manufacturing* involved a statutory time limit for appeals to the Federal Circuit. The court does not consider the case authority for retroactive application of the 1986 FCA amendments.

**24.** Such a ruling would bar five of the nine LGSF invoices, as well as 13 of the 28 CMU invoices at issue in the First Fraud Counterclaim. If the court so ruled, defendant would lose the possibility of recovering at least $36,-000.00 in penalties, exclusive of damages sustained by the FDA. Hence, the import of such a dismissal is significant in absolute numbers, if not in comparison to the entire amount claimed.

**52**

with the result that plaintiff is unaware of their existence or it must show that its injury was "inherently unknowable" at the accrual date. An example of the latter would be when defendant delivers the wrong kind of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit.... In this situation the statute will not begin to run until plaintiff learns or reasonably should have learned of his cause of action....

178 Ct.Cl. at 634, 373 F.2d at 358–59 (citations and footnotes omitted).

This court recognizes that many, if not all, of the Federal Circuit cases cited by defendant reflect an interpretation of the generic statute of limitations applicable to all government contracts. That statute, 28 U.S.C. § 2501 (1988), refers to accrual of a claim, whereas 31 U.S.C. § 3731(b) refers to commission of a violation. From this discrepancy one could infer that accrual occurs upon submission of the allegedly fraudulent claim regardless of the circumstances. Fraud allegations, however, differ in kind from other potentially time-barred allegations. In *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 347–48, 22 L.Ed. 636 (1874), the Supreme Court held that, in the proper circumstances, courts may mitigate the strict letter of a statute of limitations.

While the Court noted that equitable suits more clearly required such mitigation, the Court applied the exception equally to suits at law. Subsequent Supreme Court decisions have confirmed this general equitable tolling doctrine which "is read into every statute of limitations." *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946).[25]

These authorities counsel caution in construing the pre–1986 FCA statute of limitations in plaintiff's favor. In this case defendant alleges that plaintiff fraudulently concealed both the LGSF and CMU deficiencies after repeated warnings about defective construction. Defendant further alleges that the FDA did not discovery the alleged deficiencies until 1987 when Wiss inspected the LGSF system and when a CMU wall collapsed. Defendant also alleges that, as to the CMU walls, "the absence of column ties could not be detected by Government inspectors by visually inspecting the completed walls...." As to the LGSF backup system, defendant alleges that plaintiff and its subcontractors "covered up the uncorrected deficiencies and concealed them from Government inspectors." These allegations commend application of the general equitable tolling doctrine to the pre–1986 FCA.[26]

**25.** The Fifth and Seventh Circuits have established the date of invoicing as the accrual date for the FCA. *See United States v. Borin*, 209 F.2d 145, 148 (5th Cir.), *cert. denied*, 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647 (1954); *United States ex rel. Nitkey v. Dawes*, 151 F.2d 639, 643 (7th Cir.1945), *cert. denied*, 327 U.S. 788, 66 S.Ct. 808, 90 L.Ed. 1015 (1946). Both decisions relied on *A.J. Phillips Co. v. Grand Trunk Western Ry.*, 236 U.S. 662, 35 S.Ct. 444, 59 L.Ed. 774 (1915), and refused to toll the statute of limitations even in cases of fraudulent concealment. In *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 234 n. 11, 235, 79 S.Ct. 760, 762 n. 11, 763, 3 L.Ed.2d 770 (1959), the Court effectively repudiated *A.J. Phillips*, characterizing that case's refusal to equitably toll as "neither binding nor persuasive." *See also United States v. CFW Constr. Co.*, 649 F.Supp. 616, 618–19 (D.S.C.1986) (setting forth a comprehensive analysis of the equitable tolling doctrine and its application to the pre–1986 FCA), *appeal dismissed*, 819 F.2d 1139 (4th Cir.1987); *United States v. Uzzell*, 648 F.Supp. 1362, 1366–68 (D.D.C.1986) (surveying applicable FCA statute of limitations decisions and holding that equita-

ble tolling is mandated by Supreme Court precedent).

At oral argument plaintiff asserted that 28 U.S.C. § 2416(c), the equitable tolling statute, was inapplicable to this issue because 28 U.S.C. § 2415(a) (1988), excludes tolling of statutes of limitations where Congress has otherwise provided. The Supreme Court has spoken on this precise issue, as noted above. In any event, 28 U.S.C. § 2415(f) excludes from that statute's ambit any counterclaim by the United States that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim...."

**26.** In this respect the court parts company with the otherwise well-reasoned decision in *United States v. Target Rock Corp.*, No. CV90–4414, 1992 WL 157677, at *8 n. 12, 1992 U.S.Dist.LEXIS 9858, at *23 n. 12 (E.D.N.Y. June 30, 1992). The court notes that *several decisions speaking to this issue have elected to start the limitations period when either payment on each claim or final payment is made on the allegedly fraudulent claims. See, e.g., United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*,

If further evidence is adduced at trial that clarifies when the FDA knew or should have known of the LGSF and CMU invoicing deficiencies, the court is willing to revisit the issue. As of this date, however, defendant alleges that the FDA did not know and, because of plaintiff's alleged fraudulent concealment, could not have known of the CMU and LGSF deficiencies until March and October of 1987. Given the applicable inferences and dearth of evidence to the contrary, the court finds that defendant's claims in respect of all of the invoices accrued in 1987 and are, therefore, within the pre–1986 FCA statute of limitations. Accordingly, none of the invoices at issue is time-barred by the applicable statute of limitations.

## II. Particularity of the fraud counterclaims

■ At various points during briefing and argument, plaintiff has claimed that the fraud counterclaims are insufficiently specific and, therefore, violate RCFC 9(b). Rule 9(b) provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The purpose of this rule is threefold: to permit the formulation of a responsive pleading; to protect individuals from baseless claims; and to minimize the number of "strike" suits. Therefore, generalized fraud allegations are deemed insufficient to comport with RCFC 9(b). Fraud allegations should contain references to time, place, and manner of the fraud.

■ The court will later address this issue as it pertains to plaintiff's other grounds for dismissal. However, defendant's allegations are sufficiently particular to withstand a Rule 9(b) objection. Defendant alleges the time, place, and subject matter of the alleged frauds. Furthermore, defendant alleges the manner in which the plaintiff allegedly perpetrated them. Moreover, plaintiff has not made a compelling argument of an inability to defend or frame a responsive pleading to the fraud counterclaims. To the contrary, plaintiff's arguments evince a rather detailed understanding of the substance of the fraud allegations. The court therefore denies plaintiff's motion to the extent it requests dismissal of the fraud counterclaims pursuant to RCFC 9(b).

## III. First, second, and third counterclaims; compulsory counterclaim issue

■ Plaintiff moves to dismiss defendant's first three counterclaims pursuant to RCFC 13(a) because defendant failed to assert these counterclaims with the original answer filed on December 22, 1988, in No. 526–88C. Plaintiff asks the court to deny defendant leave to amend that answer pursuant to RCFC 13(f). Defendant counters that the prior judge's April 9, 1991 order granted defendant leave to file any remaining counterclaims and that, in any event, the counterclaims could not have prejudiced plaintiff and that leave to amend should be granted if the court construes the earlier order as insufficient.

These counterclaims all concern the masonry/brick veneer system aspect of the project, *i.e.*, the LGSF back-up system and the CMU walls. To that extent the counterclaims arise out of the transaction or occurrence that is the subject matter of plaintiff's claim in No. 468–88C filed August 8, 1988. It would have been appropri-

---

985 F.2d 1148, 1157 (2d Cir.1993); *United States v. Klein,* 356 F.2d 983 (3d Cir.1966). These decisions arguably create a bright-line test. Of course that is the appeal of a date-of-invoice approach. However, these alternate limitations tests share a singular defect: They reward the intelligent and crafty defrauder at the Government's expense. Moreover, in this case the FDA paid the invoices in reliance on plaintiff's representations that the work was complete and in the face of an alleged inability to adequately inspect the full extent and quality of plaintiff's workmanship. (Defendant must show, however, that it exercised due diligence in uncovering the alleged fraud. *Uzzell,* 648 F.Supp. at 1367.) Although plaintiff may proffer contrary and convincing evidence at trial, the court cannot dismiss the invoices at issue given the current posture of the case.

ate for defendant then to file those matured counterclaims as part of its initial December 22, 1988 answer. The question presented, therefore, is whether defendant's two- and one-half year delay in filing the first three fraud counterclaims warrants their dismissal. In order to decide this issue, the court must examine the prior judge's orders regarding counterclaims in this case and consider whether to allow defendant's first three counterclaims in the interest of justice, as contemplated by RCFC 13(f).

On September 18, 1989, the parties filed a joint motion to stay proceedings in the consolidated cases. This joint motion forms the crux of the instant dispute concerning compulsory counterclaims. In the motion the parties requested the court to stay all proceedings except, *inter alia*, the filing of counterclaims. The parties reasoned generally that the underlying factual claims had not yet matured. In particular, they stated that

> other related claims and counter-claims will ripen legally and factually during the completion of the project. These disputes either have been or will be submitted to the contracting officer for her final decision prior to completion of the project. Plaintiff and Defendant contemplate that the following actions may be filed with the Court at a later time:
>
> . . . .
>
> e) additional potential Government counter-claims.

Joint Motion for Indefinite Stay of Proceedings, filed Sept. 11, 1989, at 2. By order dated September 19, 1989, the prior judge granted the motion. Plaintiff's subsequent filings reveal only that it anticipated further liquidated damages counterclaims. An October 23, 1990 order provided that remaining counterclaims should be filed by April 23, 1991. A subsequent joint motion for enlargement of time filed April 5, 1991, again referred to further contemplated counterclaims.

Defendant adduces from the foregoing and other documentation that the prior judge implicitly allowed defendant leave to file any and all remaining counterclaims.

Plaintiff argues that defendant quotes the court out of context. Plaintiff points out that the September 18, 1989 motion only contemplated further counterclaims arising out of claims not yet submitted to the contracting officer for a final decision.

In short, the record is ambiguous as to whether the false invoicing and masonry counterclaims would be allowed. The court agrees with plaintiff that the parties' initial motion contemplated only additional counterclaims that had not yet been the subject of a final decision of the contracting officer. Defendant's delay counterclaim is an example. However, the later motions and orders fail to delimit which counterclaims were contemplated. Each side plausibly can argue that the "remaining counterclaim" language includes or excludes the false invoicing and masonry counterclaims.

 The issue must be resolved on the basis of whether the interest of justice requires that these counterclaims be allowed. Generally, leave to amend a claim should be freely given unless amendment would be futile or cause the opposing party undue prejudice. *Intrepid v. Pollock*, 907 F.2d 1125, 1128–29 (Fed.Cir.1990) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). This decision rests within the discretion of the trial court. *Foman*, 371 U.S. at 182, 83 S.Ct. at 230. The two factors most commonly taken into account are prejudice and delay. *Tenneco Resins, Inc. v. Reeves Bros., Inc.*, 752 F.2d 630, 634 (Fed.Cir.1985).

Allowing defendant to amend its answer does not prejudice plaintiff. By May 1991 this case was still in its nascent stage. The parties were in the midst of discovery, they had not filed dispositive motions, and the matter was several years away from trial. Moreover, plaintiff's masonry claims encompass the subject matter of the counterclaims at issue. Plaintiff will not bear the brunt of unanticipated discovery or research into a hitherto unexplored subject area. In *Hunt Energy Corp. v. Crosby-Mississippi Resources, Ltd.*, 732 F.Supp. 1378 (S.D.Miss.1989), *aff'd*, 979 F.2d 1533 (5th Cir.1992) (unpubl.), the court, despite finding no "oversight, inadvertence, or ex-

cusable neglect," granted the motion to amend the answer. The court opined that justice required allowing the amendment because

█ the denial of its allowance will forever bar its assertion.... [2] there has been extensive discovery on the ... [proposed counterclaim] issues.... [3] the addition of the counterclaim does not interject new issues into the case ... [and is] a logical extension of the affirmative matters which have been previously pled by defendants....

732 F.Supp. at 1389. Nor does defendant's delay rise to the egregious level found in cases where courts have refused leave to amend. *See, e.g., Hidell v. Int'l Diversified Invs.*, 520 F.2d 529 (7th Cir.1975) (where defendant filed permissive counterclaim one month after trial). The interest of justice requires that defendant's first, second, and third counterclaims be allowed as amendments to the original answer.

IV. Second, fourth, and sixth FCA counterclaims; materiality and opinion

The FCA provides, in pertinent part:

(a) Liability for certain acts.—Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

. . . .

is liable for certain monetary penalties and treble damages. 31 U.S.C. § 3729(a) (1988). The FCA does not require proof of a specific intent to defraud. 31 U.S.C. § 3729(b). In fact, the Government can premise an allegation of FCA liability on negligent submission of a claim if the contractor acts with actual knowledge, in deliberate ignorance, or with reckless disregard of the truth or falsity of the information. *See id.*

Plaintiff argues that these counterclaims fail to state a claim because none of the alleged misrepresentations is material.[27] According to plaintiff, FCA liability only attaches when a claimant misrepresents material facts. Plaintiff argues that a misrepresentation is material if it tends to or is capable of influencing the contracting officer. In this case, plaintiff reasons, the contracting officer knew the allegedly "true" facts in the submitted claims and, therefore, the alleged misrepresentations could not have been material.

█ Plaintiff correctly states that the FCA covers only those false statements that are material. Otherwise, contractors could face FCA liability for mere clerical errors. Plaintiff cites to *Kungys v. United States*, 485 U.S. 759, 770, 108 S.Ct. 1537, 1546, 99 L.Ed.2d 839 (1988), an immigration case, as holding that a misrepresentation is material if it could influence a decisionmaker. "Material," however, can also mean "[i]mportant, more or less necessary; ... going to the merits," *Black's Law Dictionary* 1128 (4th ed. 1951), or "[o]f importance to a case: RELEVANT (discussed only the most *material* concerns)." *Webster's II New Riverside University Dictionary* 732 (1984) (emphasis in original). This court subscribes to the broader definition of material. Plaintiff's definition would insulate from FCA liability a class of contractors who make knowing or even intentionally false claims that are too preposterous or inflated to influence a reasonable person. The broader definition of "material" ensures that false claims will be penalized, but only if they are an essential, important, or pertinent part of the claim.[28]

---

**27.** Plaintiff also argues that defendant fails to plead with sufficient particularity. This argument is without merit. Except as noted, defendant's counterclaims adequately detail the times, locations, and substance of the allegedly fraudulent conduct.

**28.** The Government does not have to sustain damages in order to invoke FCA liability. Plaintiff's restrictive definition strongly implies that such damage is required.

■ Plaintiff argues that FCA liability cannot attach to legal opinions contained in claims. According to plaintiff, the FCA covers only misrepresentations of fact. Plaintiff contends that many of the alleged misrepresentations alleged by defendant in the second, fourth, and sixth counterclaims are legal opinions not subject to FCA liability. To a great extent, the court agrees with plaintiff. Plaintiff's complaint frames certain allegations as opinions that would follow if the court were to find the underlying facts consistent with plaintiff's proof, *e.g.*, plaintiff's allegation that it substantially complied with contract specifications. Although the "opinion" is an ultimate finding of fact, the pleading is tantamount to plaintiff's own opinion. "The principle is fundamental that fraud cannot be predicated upon the mere expression of an opinion." *Soukaras v. United States*, 135 Ct. Cl. 88, 92, 140 F.Supp. 797, 800, *cert. denied*, 352 U.S. 918, 77 S.Ct. 214, 1 L.Ed.2d 122 (1956). Attaching FCA liability to expressions of legal opinion would have an impermissibly stifling effect on the legitimate presentation of claims. Indication is absent that Congress intended to penalize good faith disputes over contract liability.[29] *See Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, 101 (1992).

### 1. Second counterclaim

■ This counterclaim only marginally states a claim upon which relief can be granted. As with the other FCA counterclaims, defendant alleges that plaintiff is unable to support a claim submitted to the contracting officer. In particular, ¶ 125 states that plaintiff cannot support the masonry claim because it failed to comply with contract requirements and failed timely to correct construction deficiencies. Paragraph 126 indicates that plaintiff cannot support its claim due to misrepresentations contained therein. The counterclaim

sets forth three alleged misrepresentations (¶¶ 127, 128, and 129) made as part of plaintiff's January 12, 1988 claim to the contracting officer.

In ¶ 127 plaintiff essentially argues that it substantially complied with the specifications. This is a legal opinion;[30] the court strikes the paragraph. Paragraph 128 states that the FDA failed timely to object to or reject plaintiff's allegedly defective performance until sometime in 1986. Defendant points to numerous objections predating 1986. Plaintiff argues that this part of the claim is taken out of context. In context this portion of the claim criticizes the FDA for failing to object in December 1984 to other defects that it later presented as justifying demolition of the brick veneer. The court is not in a position to analyze the claim in its entirety and, therefore, cannot resolve this controversy on a motion to dismiss. Defendant has alleged that the FDA did object to plaintiff's performance prior to 1986. This is a material fact and not an opinion.[31] To this extent defendant has stated a claim. However, at trial the court will not be confined to an examination of the pleadings. The FCA is not a license for the cutting and pasting of claims. If the court later finds that this alleged misrepresentation is taken out of context, the court will either strike the paragraph or, if warranted, dismiss the counterclaim.

Paragraph 129 states that the steel stud backup system could have been repaired in December 1984 but that the FDA procrastinated for two years before ordering repairs. Defendant claims that the FDA specifically advised plaintiff in December 1984 to attach the studs with screws, welding, bridging, and bracing. Plaintiff again contends that this statement is taken out of context. As it stands, this paragraph

---

**29.** The court can envision situations where the expression of an opinion in a claim could invoke FCA liability—for example, if a contractor submitted a claim maintaining that a project was substantially complete, but, in fact, the contractor had not even broken ground on the project.

**30.** If a contract numerically or otherwise specifically defined "substantial completion," a claim that alleged substantial completion could be evaluated objectively.

**31.** The court notes that the alleged misrepresentation is contained within a legal argument concerning constructive acceptance.

states a claim. It is a material fact, sets forth a particularly alleged misrepresentation, and is not an opinion. The court again advises defendant that this counterclaim will not survive if, upon a review of the evidence supporting the entire claim, the court concludes that the counterclaim itself misrepresents the claim presented.

The FCA contemplates two types of FCA action applicable to this case: 31 U.S.C. § 3729(a) provides for liability for submission of a false or fraudulent claim, while 31 U.S.C. § 3729(b) provides for liability for misrepresentations made in the course of submission of a false or fraudulent claim. Thus, it appears that under section 3729(a) defendant's claims theoretically could survive even if the court strikes the specific misrepresentations. (Defendant does not state under which specific subsection it counterclaims.) Defendant alleges that the alleged misrepresentations are the basis for the counterclaim. *See* ¶¶ 124, 126. Therefore, if the court strikes ¶¶ 127, 128, and 129, there evidently will be little else to support this counterclaim.

### 2. *Fourth counterclaim*

 This counterclaim fails to state a claim. Defendant alleges that on January 31, 1991, plaintiff filed a false or fraudulent delay claim. Defendant alleges that plaintiff is unable to support the delay claim because the masonry construction failed to comply with contract specifications. In particular, defendant attributes this inability to two alleged misrepresentations in ¶¶ 139 and 140 of its counterclaim. In ¶ 139 plaintiff claims that on February 28, 1986, the project was substantially complete. Once again, this is plaintiff's opinion of what the proofs will show. Even if at that time the project was unsafe and defective, FCA liability will not attach for such a statement in the absence of an objective contract definition for "substantial completion."

In ¶ 140 of defendant's counterclaim, plaintiff contends that the project was substantially complete six months in advance of the contract completion date. Plaintiff also charges that design deficiencies caused the delay in final project completion. Defendant alleges that these statements are false. Again, these statements represent plaintiff's opinions. Perhaps the court will concur with defendant that the project was not substantially complete in February 1986, or that no design deficiencies are attributable to the FDA, but such rulings would not amount to a determination that plaintiff's claim was false or fraudulent. The court dismisses the fourth counterclaim.

### 3. *Sixth counterclaim*

 Defendant alleges that on January 17, 1991, plaintiff submitted a false or fraudulent CMU paint claim to the contracting officer. In this counterclaim defendant states that "[t]he CMU paint claim ignores the documented failure of" plaintiff's subcontractor to apply epoxy filler and ignores a modification granting plaintiff increased costs for applying that paint. Def's Third Amended Counterclaim filed July 6, 1992, ¶ 148. In ¶ 148 defendant alleges that plaintiff cannot support the claim because the subcontractor unilaterally substituted and applied a vinyl block filler instead of applying the epoxy filler. Defendant also alleges that plaintiff cannot support the claim because of an accord and satisfaction dated August 18, 1986, settling any additional painting costs.

In particular, defendant lists five specific misrepresentations (¶¶ 150–54), allegedly demonstrating plaintiff's inability to support the CMU paint claim. In ¶ 150 of defendant's counterclaim, plaintiff asserts that it added additional block filler per instructions from the FDA. Defendant characterizes this statement as false or fraudulent because the filler was not added. In ¶ 151 plaintiff charges that design errors caused the failure of the CMU paint and walls. Defendant alleges that this statement is false or fraudulent because plaintiff "knows" that the subcontractor did not apply epoxy block filler. In ¶ 152 plaintiff claims that the FDA should bear the increased cost of the modified paint system. Defendant alleges that this statement is false or fraudulent because plaintiff settled

this claim via Modification No. 200. In ¶ 153 plaintiff states that the CMU walls began to crack and peel after application of FDA-specified modified paint system. Defendant alleges that this statement is false or fraudulent because plaintiff knows that the subcontractor failed to apply the specified paint system. Finally, in ¶ 154 plaintiff contends that after plaintiff's application of the FDA-approved modified paint system, the CMU paint began to crack and peel. Defendant alleges that this statement is false or fraudulent because plaintiff knows that the modified paint system was not applied.

At oral argument plaintiff contended that defendant quoted the CMU paint claim out of context. As to ¶¶ 150, 153, and 154, plaintiff asserted that the full text of the claim did not support defendant's version of events. Plaintiff reasoned that the FDA, in fact, had authorized or approved the substitute vinyl filler for use in certain CMU wall locations. Plaintiff acknowledged that it did not apply the epoxy in all CMU wall areas, but asserted that it had applied the epoxy in some areas. As to ¶¶ 151 and 152, plaintiff argues that these contain legal opinions not subject to FCA liability.

The court confronts a situation similar to that represented by the second counterclaim. As it stands, this counterclaim survives a motion to dismiss for failure to state a claim. Except for ¶¶ 151 and 152, which the court strikes as legal opinions not subject to FCA liability, the allegations are factual and material. Plaintiff made a claim based on assertions that it applied a certain paint system when it knew that it had not applied the paint system. However, at trial or in a later proceeding, the court will review the entire text of the claim. If defendant quotes the CMU paint claim out of context, the court will strike the affected paragraphs and, if warranted, dismiss this counterclaim.

## V. CDA counterclaims; intent and knowledge

■ The CDA fraudulent claims provision provides, in pertinent part:

If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government. . . .

41 U.S.C. § 604. The CDA defines misrepresentation of fact as

a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead.

41 U.S.C. § 601(7). Therefore, defendant must first prove that plaintiff cannot support part of his claim. Defendant must then show that this inability is due to fraud or a false statement of a material fact or like conduct made with the requisite intent. The legislative history supports this requirement of proof: "Misrepresentation is interpreted to mean when intent to deceive or mislead *is proven.*" S.Rep. 1118, 95th Cong., 2d Sess. 8 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5242–243 (emphasis added).

Plaintiff argues that the CDA's plain language and its legislative history compel dismissal of plaintiff's CDA counterclaims because defendant fails to specifically allege intent to deceive or mislead. Each of plaintiff's CDA counterclaims incorporates by reference the general allegations made in ¶¶ 62–113, as well as allegations of the previous counterclaims. In the general allegations, defendant charges, *inter alia,* 1) that plaintiff ordered continued construction of the LGSF system with full knowledge of its deficiencies (¶ 83) and "covered up the uncorrected deficiencies and concealed them from the view of government inspectors;" and 2) with respect to the CMU walls (¶ 90), that plaintiff "intentionally failed to install the required ties at the steel columns." Each of the FCA counterclaims, incorporated in the CDA counterclaims by reference, states that plaintiff "knowingly made, used or caused to be made or used, false statements and representations in an attempt to get the [specified] . . . claim paid or approved by the Government." *See, e.g.,* ¶¶ 124, 136, 148.

Plaintiff presents a highly restrictive interpretation of the CDA and the rules of pleading. Under plaintiff's theory, intent to deceive, mislead, or defraud is such an integral element of a CDA claim that failure to allege the requisite intent becomes fatal. Given what defendant alleges in the general allegations and the FCA counterclaims, the issue, then, is whether defendant's failure to allege intent to deceive, mislead, or to defraud compels dismissal of the CDA counterclaims. The court rejects plaintiff's argument because the CDA only requires that misrepresentation be pleaded and defines the term misrepresentation to include the requisite intent.

### 1. *Third counterclaim*

■■■ Defendant's general allegations, noted above, concern the LGSF and CMU portions of the project. In the context of the claims submitted to the contracting officer, these allegations detail specific fraudulent conduct. These allegations, along with those contained in the first fraud counterclaim, describe plaintiff's alleged knowing failure to properly attach studs, followed by a cover-up from Government inspectors. Defendant further describes a knowing and intentional failure to install column ties, followed by a similar cover-up. Finally, defendant alleges that plaintiff submitted a claim to the contracting officer for the overall masonry work. These allegations may fail to state magic words of "intent to deceive" or "intent to mislead," but they sufficiently describe fraudulent conduct to state a CDA counterclaim.

### 2. *Fifth counterclaim*

■■■ This counterclaim fails to state a claim. The claim seeks compensation for additional work and delays. The claim also requests a time extension. As described in the discussion of the fourth counterclaim, the alleged misrepresentations made in the claim cannot be deemed fraudulent. To be sure, the claim may contain an ultimately untenable legal opinion, but such an opinion cannot be the subject of FCA liability. Accordingly, the court dismisses the fifth counterclaim.

### 3. *Seventh counterclaim*

■■■ Like the second, third, and sixth counterclaims, the seventh counterclaim states a claim subject, however, to the court's review of evidence supporting plaintiff's entire claim. If the court dismisses the sixth counterclaim after trial, the seventh counterclaim will also be dismissed. As it stands, this counterclaim alleges that plaintiff is unable to support the CMU paint claim because plaintiff knowingly made false or fraudulent statements as part of the claim. This is sufficient to state a CDA counterclaim.

### 4. *Defendant's knowledge*

■■■ Plaintiff also argues that the court must dismiss the CDA counterclaims at issue because, at the time of their submission, the FDA knew all the facts associated with the claims. According to plaintiff, defendant cannot allege an intent to deceive if the Government knew of the very facts which render the claim false. In this case plaintiff points to the ongoing nature of the disputes as proof of defendant's knowledge of the underlying allegedly fraudulent facts. At this early juncture the court cannot accept plaintiff's argument.

Plaintiff cites to *Boisjoly v. Morton Thiokol, Inc.*, 706 F.Supp. 795 (D.Utah 1988). The court dismissed a FCA claim in part because

> courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false. . . . Only if the Government gets something less than or different from that which it expected can it be said to have suffered the kind of injury necessary to invoke FCA liability.

*Id.* at 809.

This court discerns several problems with *Boisjoly*. First, the court imputed to the FCA an intent requirement not accepted in this circuit before or after the 1986 amendments. *See Acme Process Equipment Co. v. United States*, 171 Ct.Cl. 324, 354 n. 26, 347 F.2d 509, 527 (1965), *rev'd on*

*other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). Second, *Boisjoly's* reasoning would reward brazen contractors by completely excluding from CDA liability obviously fraudulent claims. Such a rule of law would penalize a diligent, informed contracting officer, while simultaneously insulating the defrauding contractor. The CDA was not intended to so limit the Government's anti-fraud capabilities. Thirdly, the Second and Ninth Circuits have criticized *Boisjoly* on this particular point. In *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991), another FCA case, the court stated

> [t]hat a defendant has disclosed all the underlying facts to the government may, the United States in its brief concedes, show that the defendant had no intent to deceive.... That the relevant government officials know of the falsity is not in itself a defense.... *Boisjoly* may be defensible on its facts; its dicta are an unreliable guide.

*Hagood* notes that knowledge may be relevant to rebut a required mental state, but that such a determination could not be made "by mere inspection" of the complaint. Rather, such a decision should be made at trial or summary judgment. *Id.* at 1421. Moreover, plaintiff's reliance on *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 777 F.Supp. 195 (N.D.N.Y.1991), is misplaced. On appeal the Second Circuit, while affirming the district court's decision, expressly disavowed the lower court's treatment of the knowledge issue. The court stated:

> We disagree with *Boisjoly's* interpretation of § 3729(a)(1), and concur in the contrary view expressed by the Ninth Circuit in ... [*Hagood* ].... That case expressly rejected the contention that government knowledge automatically bars an FCA action.... [W]e agree that ... [*Boisjoly* ] is an unreliable guide....

985 F.2d 1148, 1156 (2d Cir.1993).

The foregoing case law relates to FCA actions and does not foreclose discussion about whether the Government's knowl-edge impacts on its ability to prove an intent to deceive or mislead, or, indeed, to prove reliance. However, the court's task at this juncture is to review the sufficiency of a counterclaim.

## VI. Special plea in fraud

The statute provides:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

> In such cases the United States Claims Court shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514 (1988). Plaintiff makes three arguments. First, plaintiff asserts that this statute only applies to those claims brought by a contractor in the Court of Federal Claims. In other words, the Government can only file a section 2514 counterclaim if the contractor sues on the same claim in its case in chief. Secondly, plaintiff also argues that defendant's failure specifically to allege intent to defraud, materiality, reliance, injury, and corruption mandates dismissal of the count. Finally, plaintiff argues that defendant's knowledge of the facts underlying the alleged fraudulent conduct estops defendant from counterclaiming under this statute. The court discussed the knowledge issue in the last section.

1. *Propriety of a counterclaim in fraud not arising from allegations in plaintiff's complaint*

In its reply brief and at oral argument, plaintiff strenuously argued that the forfeiture statute applies only to claims asserted in court. According to plaintiff, it has never prosecuted a claim in the Court of Federal Claims related to the invoices at issue in the first counterclaim. Therefore, plaintiff urges that defendant cannot premise the eighth counterclaim on allegations contained in the first.

Before discussing plaintiff's main arguments, the court notes that several of de-

fendant's counterclaims survive this motion to dismiss. Thus, insofar as they support a section 2514 counterclaim, this issue may be moot.[32] The CDA counterclaims, if proven, would support a section 2514 counterclaim. The court nevertheless will address this issue because of the potential evaporation of defendant's second, third, sixth, and seventh counterclaims.

The plain language of the forfeiture statute does not support plaintiff's argument. By its terms the statute applies to fraud practiced in the proof of claims. The statute does not specify where such claims must be presented in order to invoke the statute. Claims for payment before a contracting officer are as subject to "proof, statement, establishment, or allowance" as are claims before the Court of Federal Claims. That the statute empowers the court to "specifically find such fraud or attempt and render judgment" does not restrict the forfeiture remedy to perpetration of such fraud in a claim before the court. In sum, this court is of the view that the statute provides a harsh remedy in the Court of Federal Claims for those who practice or attempt to practice fraud against the Government either by submitting claims or invoices to the contracting officer or by bringing claims before a court.

*O'Brien Gear & Machine Co. v. United States*, 219 Ct.Cl. 187, 591 F.2d 666 (1979), is not to the contrary. In *O'Brien* the plaintiff attempted to practice a fraud in the proof of a claim before the Court of Claims. The *O'Brien* court did not exclude from section 2514's ambit fraud practiced in the proof of claims before a federal agency, as is alleged in this case.

The court does not accept plaintiff's implication that invoices are not claims and,

as such, fall outside the scope of the statute. Invoices for progress payment are claims for payment, even if they do not require a final decision from the contracting officer. In *Jerman v. United States*, 96 Ct.Cl. 540 (1942), cited by defendant, the Court of Claims rendered a judgment of forfeiture on an invoice for goods sold to the Government. In particular, the court noted:

> the presentation of a fraudulent invoice must have been within the intent of the statute, unless the word "claim" is to receive an interpretation so narrow as to exclude nearly all transactions with the government except actual suits either in court or before a quasi judicial officer or agency. . . . We do not think that Congress would have had any reason for distinguishing between, or showed any intention to distinguish between, the presentation of a false invoice to a purchasing agent of the government having authority to issue a voucher for its payment, and a similar presentation to the Comptroller General or to the court. In any case its purpose is to fraudulently obtain money from the United States. . . .

*Id.* at 552. The Government's ability to counterclaim under this section cannot be based on whether a plaintiff dares to advance a fraudulent claim in the court. Accordingly, the section 2514 action will not be dismissed because it is arguably based on claims not advanced by plaintiff in court.

### 2. Failure to allege intent to defraud, materiality, reliance, injury, and corruption

Plaintiff faults defendant for failing to specifically allege intent to defraud, materiality, reliance, injury, and corruption in the eighth counterclaim. This issue is largely resolved with reference to the court's discussion of intent in connection with the

---

**32.** Plaintiff seemingly assumes that the second and sixth FCA counterclaims could not support a section 2514 counterclaim. The court agrees that, to the extent that the surviving FCA counterclaims prove plaintiff's knowledge of the claims' falsity, but fail to show intent to deceive or mislead, the FCA counterclaims may not support the special plea in fraud.

Whether the invoices involved in the first counterclaim are unrelated to any claims ad-

vanced by plaintiff in the court is an open question. For example, the subject matter of LGSF and CMU invoices indisputably overlaps plaintiff's masonry claim. The court recognizes that invoices are not the same as a claim to the contracting officer. Such semantic differences blur the fact that the counterclaims and invoices at issue both cover the same subject matter.

CDA counterclaims. The issue restated is whether the failure specifically to plead the requisite elements compels dismissal of defendant's section 2514 counterclaim. The court regards this issue as properly resolved by putting defendant to its proof of fraud.[33]

### CONCLUSION

In the interest of encouraging fruitful settlement discussions, the court offers the following comments. The court dismisses only two out of defendant's eight counterclaims. However, except for the false invoicing counterclaim, the five remaining counterclaims are in a precarious position. The sixth and seventh depend on whether defendant quoted the paint claim out of context. The second and third counterclaims appear marginally stronger, but they, too, may have been quoted out of context. It is an open question whether the third counterclaim survives if the second is dismissed. Moreover, the eighth depends for its survival on any one or possibly all of the others.

Accordingly, based on the foregoing, plaintiff's motion to dismiss is granted as to the fourth and fifth fraud counterclaims and is denied as to the remaining fraud counterclaims.

**IT IS SO ORDERED.**

---

**33.** The statute provides for forfeiture for an attempt to practice a fraud. It is unclear whether defendant must prove reliance or damages under this statute.